UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| J.M.P.,<br><br>                            Petitioner,<br><br>              v.<br><br>PAUL ARTETA, et al.,<br><br>                           Respondents. | 25 Civ. 4987 (DEH)<br><br>**OPINION**<br>**AND ORDER** |

DALE E. HO, United States District Judge:

On June 12, 2025, Petitioner J.M.P.[1] filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging the length of his detention by Immigration and Customs Enforcement ("ICE") and seeking, *inter alia*, an order requiring an individualized hearing before an impartial adjudicator. *See* Pet. for Writ of Habeas Corpus ("Pet."), ECF No. 1. Pursuant to a briefing schedule proposed by the parties and adopted by the Court, ECF No. 12, Respondents filed their Opposition on August 15, 2025, and Petitioner filed his Reply on August 22, 2025. *See* Resp'ts' Mem. Opp'n ("Opp'n"), ECF No. 16; Pet'r's Reply ("Reply"), ECF No. 17. For the reasons stated herein, the Petition is **GRANTED** to the extent that the Court finds that J.M.P. is entitled to an individualized bond hearing, in which the Government bears the burden of proving by clear and convincing evidence that he poses a risk of flight or a danger to the community.

## BACKGROUND

Petitioner J.M.P. is a 23-year-old from El Salvador. *See* Pet. ¶ 26. Growing up in El Salvador, he was regularly harassed and assaulted by gang members who demanded money or assistance from him. *Id.* After repeatedly resisting pressure to join the gangs, he eventually became a target. *Id.* When J.M.P. was a teenager, gang members extorted him and his family's

---

[1] The Court granted J.M.P. leave to proceed under a pseudonym. *See* ECF No. 5.

bakery for money; he "paid because [he] had no choice." *Id.* ¶ 31 n.2.  Under threat of violence, J.M.P. gave Mara Salvatrucha ("MS-13") members small amounts of money on a few occasions. *Id.* ¶ 31 & n.2.

When he was around 14 years old, J.M.P. was physically attacked by several gang members and ended up in the hospital. *Id.* ¶ 26.  At the hospital, he learned he was under arrest. *Id.*  He was charged with attempted aggravated homicide, resisting arrest, and gang affiliation in El Salvador. *See* ECF No. 13.  J.M.P. was tried as a minor and found guilty of attempted aggravated homicide and resisting arrest; the gang affiliation charge was dismissed. *Id.*  He received a sentence of one-and-a-half years and served 14 months at a juvenile rehabilitation facility in El Salvador called Sendero de Libertad. *Id.*

J.M.P. attempted to move to another city in El Salvador for his safety, but the threats and violence from gangs continued.  Pet. ¶ 27.  In 2020, when J.M.P. was approximately 18 years old, he fled to the United States to escape the pressure, threats, and violence from gangs. *Id.*  While in the United States, J.M.P. has lived a quiet life. *Id.*  Prior to his detention by ICE, he worked, lived with his father, and spent time with family in the United States. *Id.* ¶ 48.  He has never been prosecuted for a crime while in the United States; until January 2025, he had never been arrested in the United States. *Id.* ¶ 27; ECF No. 14-1 at 2 ("Subject has no criminal history").

On January 28, 2025, J.M.P. was at home when agents from the Drug Enforcement Administration ("DEA") raided his home, pointed a gun to his head, and arrested him in his bedroom.  Pet. ¶ 28.[2]  On January 29, 2025, after no criminal charges were filed, the DEA turned

---

[2] It is unclear what precipitated J.M.P.'s arrest, but Petitioner asserts that:

> The week prior to J.M.P.'s arrest, both the Acting Attorney General and Acting DHS Secretary issued memoranda to their respective staff authorizing law enforcement within the DOJ, including DEA agents, to conduct immigration-related enforcement actions that are usually reserved for DHS officers. *See* DOJ Mem., Interim Policy Changes Regarding Charging, Sentencing, and Immigration

him over to ICE. *Id.* ¶ 29. His father was arrested the same day and placed in ICE custody. *Id.* ¶ 48; Reply at 3.

ICE charged J.M.P. with removability under the Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i) (presence in the United States without being admitted or paroled), and placed him in removal proceedings at the Varick Street Immigration Court in New York, NY. *See* ECF No. 14-2 at 1. When ICE questioned him about any affiliation with gangs or terrorist organizations, he stated he was not affiliated with any such organizations. *See* ECF No. 14-1 at 3. ICE has detained J.M.P. at Orange County Jail since January 29, 2025. *See* ECF No. 15 ¶ 8.

On March 4, 2025, J.M.P. requested a custody redetermination, which was scheduled for March 11, 2025. ECF No. 15 ¶¶ 12-13. On March 10, 2025, however, DHS filed a RAP sheet in the bond record showing the criminal charge in El Salvador, and J.M.P.'s removal counsel withdrew the request for a custody determination. Pet. ¶ 30. On March 11, 2025, J.M.P. submitted

---

Enforcement (Jan. 21, 2025), *available at* https://www.aila.org/aila-files/75FE2DCB-6CC2-483A-841E-A7A856A7852B/25012912.pdf?1738188120; "Statement [] on Directive Expanding Immigration Law Enforcement to Some Department of Justice Officials," DHS (Jan. 23, 2025), https://www.dhs.gov/news/2025/01/23/statement-dhs-spokesperson-directive-expanding-immigration-law-enforcement. Since these directives, DEA agents have conducted multiple immigration-related arrests on behalf of DHS. These arrests were for the purpose of "immigration-related investigations" and "immigration enforcement efforts," and resulted in detention of numerous people without criminal records. *See, e.g.*, Reuven Blau and Gwynne Hogan, "One Hundred NYC Immigrants Arrested in Week One of Trump ICE Raids," The City, Feb. 5, 2025, *available at* https://www.thecity.nyc/2025/02/05/ice-arrests-trump-immigrant-crackdown/ (describing how the DEA special agent in charge acknowledged that joint-agency teams do not "exclusively arrest people suspected of criminal activity"); "DEA in Los Angeles helping feds with immigration enforcement efforts," Fox11 (Jan. 26, 2025), https://www.foxla.com/news/dea-la-helping-feds-immigration-enforcement-efforts.

Reply at 2 & n.2.

a motion to suppress and terminate his removal proceedings. *Id.* The Immigration Court denied that motion on March 19, 2024. *See* ECF No 15 ¶ 14.

On March 31, 2025, J.M.P. filed his Form I-589 application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Reply at 3; *see* Pet. ¶ 31 & n.2. On May 13, 2025, J.M.P. had an individual merits hearing on his Form I-589 application. *See id.* ¶ 31; Reply at 3-4. Before going on the record, the immigration judge stated that J.M.P. was subject to mandatory detention due to providing "material support to a terrorist organization," specifically by giving MS-13 members small amounts of money on two or three occasions when he was a minor in El Salvador. Pet. ¶ 31. By oral decision that day, the immigration judge denied his application for relief and ordered J.M.P. removed. Pet. ¶ 31; Reply at 4. On May 16, 2025, J.M.P. filed a motion asking the immigration judge to clarify which statutory authority he was detained under and, if he were eligible, to schedule a bond hearing. Reply at 4; Pet. ¶ 32. No decision on that motion had issued as of August 22, 2025. *See* Reply at 4.

On June 11, 2025, J.M.P. timely appealed the removal order and denial of his Form I-589 application to the Board of Immigration Appeals ("BIA"); the immigration court's merits decision is therefore not final. Pet. ¶ 33. As of August 22, 2025, no briefing schedule had yet been issued on the merits appeal. *See* ECF No. 15 ¶ 19.

After their detention by ICE, J.M.P. and his father lost the home they had lived in for several years, along with most of their possessions, which were discarded after their arrest. Pet. ¶ 48. J.M.P.'s detention has prevented him from financially supporting his family in the United States and in El Salvador. *Id.* To date, J.M.P. has been detained for more than seven months. *See id.*

4

## DISCUSSION

The parties agree that because J.M.P. is detained pursuant to the provision of the INA providing for mandatory detention, codified at 8 U.S.C. § 1226(c), his constitutional challenge is governed by the framework set forth by the Second Circuit in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024).[3] *See* Opp'n at 7-8; Reply at 6. In *Black*, the Second Circuit observed that "[t]he Supreme Court has held that detention under section 1226(c) without an initial bond determination does not, on its face, violate the detainee's due process rights where detention is 'for the limited period of . . . removal proceedings.'" *Black*, 103 F.4th at 141 (quoting *Demore v. Kim*, 538 U.S. 510, 531 (2003)). But the Circuit went on to explain that "*Demore* was careful to emphasize the relatively short duration of section 1226(c) detention, stressing data showing that detention under section 1226(c) lasts roughly a month and a half in 85% of cases, and four months where the noncitizen chooses to appeal." *Id.* at 151 (citing *Demore*, 538 U.S. at 529). The Circuit then concluded that, while due process does not require an initial bond hearing for noncitizens detained under § 1226(c), detention under § 1226(c) might become unreasonably prolonged so as to necessitate "additional procedural protections," such as a bond hearing. *Id.* at 145. The Second Circuit further held that due process challenges under § 1226(c) should be reviewed under the analysis set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which takes into consideration: (i) the private liberty interest affected, (ii) the risk of erroneous deprivation of that interest and the probable value of additional procedural safeguards, and (iii) the government's interest, including the function involved and the burdens that additional procedural requirements would create. *Black*, 103 F.4th at 147.

---

[3] In all quotations from cases, the Court omits citations, footnotes, emphases, internal quotation marks, brackets, and ellipses, unless otherwise indicated.

Evaluating the *Mathews* factors in the current case and following the Second Circuit's guidance in *Black*, the Court concludes that J.M.P. is entitled to a bond hearing at which Respondents bear the burden of showing the need for his continued detention.

A. **The Private Interest**

Here, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Black*, 103 F.4th at 151 (quoting *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020)). "Case after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Velasco Lopez*, F.3d at 851. While detention without an initial bond determination is permissible under section 1226(c) for a limited period, *see Black*, 103 F.4th at 141, where, as here, a petitioner has been "detained for far longer, . . . their liberty interests [are] more seriously infringed," *id.* at 151. In *Black*, one petitioner faced a "seven-month-long detention" that prevented him from being able to support his family financially. *See id.* The same is true here, as J.M.P. has been in detention for more than seven months and has been unable to contribute to his family's financial support in that time. *See* Pet. ¶ 48.

The petitioners in *Black* were detained under § 1226(c) based on prior aggravated felony convictions in this country. 103 F.4th at 138-40. The Second Circuit held that they had a significant interest in being free from imprisonment notwithstanding the fact that their "detentions in some sense were 'the result of a criminal adjudication,' since a conviction was the premise for applying section 1226(c)." *Id.* at 151 (quoting *Velasco Lopez*, 978 F.3d at 851). Here, J.M.P.'s detention under § 1226(c) is premised not on any criminal adjudication but on the immigration judge's determination that he is subject to the ground of inadmissibility for noncitizens who have "engaged in a terrorist activity," 8 U.S.C. § 1182(a)(3)(B)(i). J.M.P.'s private interest here, accordingly, is at least commensurate with that of the petitioners in *Black*.

6

Moreover, much like the petitioners in *Black*, J.M.P. had "no administrative mechanism by which [he] could have challenged [his] detention on the ground that it reached an unreasonable length." *Black*, 103 F.4th at 151 (quoting *Velasco-Lopez*, 978 F.3d at 852). He has now been detained for more than seven months—the same length as one of the two petitioners in *Black*, whose liberty the Second Circuit found had been "seriously infringed." *Id.* In addition, J.M.P.'s private interests were "seriously affected by his prolonged detention." *Id.* His "seven-month-long detention [has] led unsurprisingly to serious financial difficulties for his family." *Id.* As a result of his and his father's detentions, J.M.P. lost the home he had lived in for several years, along with most of his possessions. Pet. ¶ 48. J.M.P.'s detention has further prevented him from financially supporting his family in the United States and El Salvador. *Id.*

For these reasons, following the analysis in *Black v. Decker*, the Court concludes that the first *Mathews* factor weighs heavily in favor of J.M.P.

### B. The Risk of an Erroneous Deprivation of Their Interests and the Probable Value of Additional Procedural Safeguards

"The second *Mathews* factor is 'the risk of an erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'" *Black*, 103 F.4th at 152 (alteration in original) (quoting *Mathews*, 424 U.S. at 335). "The only interest to be considered at this part of the *Mathews* analysis is that of the detained individuals—not the government." *Id.* (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 530 (2004)). In *Black*, the Second Circuit cautioned that the risk of erroneous deprivation is amplified in the context of § 1226(c), which "sweeps in people convicted of many nonviolent offenses and does not take into account when the prior crime was committed, suggesting that the prior conviction may well be a poor proxy for a finding of dangerousness." 103 F.4th at 152. The Circuit further observed that the "procedures used for section 1226(c) detainees are very few," and

7

that its "broad reach means that many noncitizens are detained who, for a variety of individualized reasons, are not dangerous, have strong family and community ties, are not flight risks and may have meritorious defenses to deportation at such time as they are able to present them." *Id.*

Turning to the facts at hand in *Black*, the Second Circuit then determined that the risk of erroneous deprivation was high, noting that, although the petitioners each had a criminal conviction, they had lived law-abiding lives in the years since. *See id.* at 153. The same is true here. In the five years since J.M.P. arrived in the United States, the record reflects that he has lived peacefully with his father in New York and has not been arrested or convicted of any crimes. *See* Pet. ¶ 27; ECF No. 14-1 at 2 ("Subject has no criminal history"). Thus, like the petitioners in *Black*, the "peaceful" and "lawful" life J.M.P. has led since arriving here "suggest[s] a high likelihood that he was subject to an erroneous deprivation of liberty as his section 1226(c) detention was prolonged." *Black*, 103 F.4th at 153. Finally, the immigration judge's invocation of the "terrorist activity" ground of inadmissibility, 8 U.S.C. § 1182(a)(3)(B)(i), based on small payments J.M.P. made to a gang under duress when he was a minor in El Salvador, only heightens concerns about the erroneous deprivation of his liberty.

Respondents argue that noncitizens like J.M.P. already have a procedural avenue to challenge the basis for their mandatory detention: a *Joseph* hearing, at which an immigration judge determines whether the noncitizen is in fact properly included in one of the categories of mandatory detention under § 1226(c). Opp'n at 9-10 (citing *Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999)). But the Second Circuit squarely rejected this argument in *Black*, observing that exiting procedural protections for those detained under § 1226(c), including *Joseph* hearings, "include no mechanism for a detainee's release, nor for *individualized review* of the need for detention." *Black*, 103 F.4th at 152 (emphasis added). Accordingly, a *Joseph* hearing is no substitute for the process to which J.M.P. is entitled under the Fifth Amendment.

8

The Court therefore concludes that the second *Mathews* factor, too, weighs heavily in favor of J.M.P.

### C. The Government's Interest

"The third *Mathews* factor considers 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Id.* (quoting *Mathews*, 424 U.S. at 335). Respondents articulate two legitimate interests recognized in *Black*: (1) "ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from noncitizens who have been involved in crimes that Congress has determined differentiate them from others." *Id.* But the additional procedural safeguards allowed in *Black* "do nothing to undercut those interests," because "[a]t any ordered bond hearing, the IJ would assess on an individualized basis whether the noncitizen presents a flight risk or a danger to the community." *Id.* at 153-54.

Moreover, "while the government's legitimate interests justify a relatively short-term deprivation of liberty, the balance of interests shifts as the noncitizen's detention is prolonged without any particularized assessment of need." *Id.* at 154  Here, like one of the petitioners in *Black*, J.M.P. has been detained for more than seven months without an individualized assessment of whether he presents a flight risk or a danger to the community.

Respondents contend that the government's interest is heightened here because of J.M.P.'s attempted homicide conviction in El Salvador when he was fourteen years old. Opp'n at 10 (citing ECF No. 13). But a number of mitigating factors might well lead an immigration judge to conclude that J.M.P.'s past conviction does not make him a danger to the community today, such as J.M.P.'s young age at the time; the fact that no one was injured during the underlying events; the nearly ten years he has since spent living a peaceful and productive life; and the fact that J.M.P. has no criminal convictions in the United States. Similarly, the coerced and *de minimis* nature of the

9

payments he made to the gang many years ago, though deemed insufficient by the immigration judge to relieve J.M.P. of his *statutory* inadmissibility, might nevertheless support his release on bond because they do not suggest any danger to the community here in the United States.

Accordingly, the Court concludes that the third *Mathews* factor, too, supports J.M.P.'s requested relief.

\* \* \*

In sum, all three *Mathews* factors point toward one conclusion: J.M.P. is entitled to an individualized bond hearing before an immigration judge. At that bond hearing, the burden will be on Respondents to prove the need for J.M.P.'s continued detention by clear and convincing evidence. *Black*, 103 F.4th at 157-58. The immigration judge may consider any mitigating factors in assessing whether J.M.P. poses a danger to the community, and it must consider both J.M.P.'s ability to pay and alternatives to detention when setting any bond amount. *Id.* at 158.

## CONCLUSION

For the foregoing reasons, Petitioner's petition for a writ of habeas corpus is **GRANTED in part**. By **September 25, 2025**, subject to extension on consent of the parties, Respondents shall provide an individualized bond hearing to Petitioner at which Respondents bear the burden of proving by clear and convincing evidence that his continued detention is justified. Should they fail to provide such a hearing, Respondents shall release Petitioner from detention. Respondents shall file a status letter to update the Court about Petitioner's status by **September 26, 2025**.

In their briefs, the parties did not address Petitioner's request for attorney's fees and costs under the Equal Access to Justice Act. *See* Pet. at 19. Should Petitioner continue to seek such relief, the parties shall file a joint status letter proposing a briefing schedule by **September 26, 2025**.

  The Court received a notice of appearance of counsel filed as a motion on the docket. *See* ECF No. 18. The Clerk of Court is respectfully directed to close the motion at ECF No. 18.

SO ORDERED.

Dated: September 10, 2025

  New York, New York

_____

DALE E. HO
United States District Judge
