UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

J.M.P.,

                              Petitioner,

                    v.

PAUL ARTETA, et al.,

                              Respondents.

---

25 Civ. 4987 (DEH)

**OPINION
AND ORDER**

---

DALE E. HO, United States District Judge:

Petitioner J.M.P.[1] filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging his lengthy detention by the Department of Homeland Security, Immigration and Customs Enforcement ("ICE" or "DHS") and seeking, *inter alia*, an order requiring an individualized bond hearing before an impartial adjudicator.[2]  On September 10, 2025, this Court granted the petition in part, holding that, under the framework set forth by the Second Circuit in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), J.M.P.'s prolonged detention without a bond hearing deprived him of due process.  *See J.M.P. v. Arteta*, No. 25 Civ. 4987, 2025 WL 2614688 (S.D.N.Y. Sep. 10, 2025).  Consistent with the Second Circuit's guidance in *Black*, the Court ordered that J.M.P. be provided an individualized bond hearing before an immigration judge at which the Government would bear the burden of proving by clear and convincing evidence that his continued detention was justified.  *See id.* at *5.

On September 19, 2025, an immigration judge ("IJ") held a bond hearing and issued an oral ruling granting J.M.P.'s release under $15,000 bond.[3]  Nevertheless, J.M.P. has not been

---

[1] The Court granted J.M.P. leave to proceed under a pseudonym.  *See* ECF No. 5.

[2] *See* Pet. Writ of Habeas Corpus ("Petition") at 19, ECF No. 1.

[3] *See* Pet'r's App. O.S.C. ("App.") Ex. B ("Form Bond Order"), ECF No. 20-2.

permitted to post bond, because ICE has invoked two successive procedures to stay the IJ's order. First, ICE triggered an automatic stay of the bond order, pursuant to 8 C.F.R. § 1003.19(i)(2), by filing a Form EOIR-43 Notice of ICE Intent to Appeal Custody Redetermination.[4]  Shortly thereafter, J.M.P. filed a motion for a temporary restraining order and preliminary injunction in this Court (the "Motion") arguing that the unilateral automatic stay violated due process, citing more than a dozen district court opinions in recent weeks that held the automatic stay procedure unconstitutional.[5]  The next day, ICE withdrew the Form EOIR-43, purporting to dissolve the automatic stay.[6]  It then filed a motion for a discretionary stay with the Board of Immigration Appeals ("BIA" or "Board") pursuant to 8 C.F.R. § 1003.19(i)(1), enclosing several of its own bond hearing exhibits and a notice of appeal, but not J.M.P.'s exhibits nor a transcript of the hearing.[7]  Two hours later, in a three-sentence order, the BIA granted the stay request without waiting for a response from J.M.P. or the full record of the bond proceeding.[8]

In his Motion before this Court, J.M.P. challenges the constitutionality of his continued detention, arguing that ICE's invocation of the automatic and discretionary stay processes deprived him of due process under the Fifth Amendment to the U.S. Constitution.  He seeks an order directing Respondents to release him from their custody, subject to reasonable and appropriate

---

[4] *See* App. Ex. A ("First Lauterback Decl.") ¶¶ 15-18, ECF No. 20-1; App. Ex. C, ECF No. 20-3.

[5] *See* App., ECF No. 20; Mem. Supp. Mot. TRO ("Pet'r Mem."), ECF No. 21.

[6] Second Morrow Decl. Ex. C, ECF No. 24-3.

[7] Second Morrow Decl. Ex. B ("Emergency Stay Mot."), ECF No. 24-2.

[8] Second Morrow Decl. Ex. D ("BIA Stay Order"), ECF No. 24-4; Second Lauterback Decl. ¶¶ 5-7, ECF No. 26-1; Sep. 29, 2025 Hr'g Tr. ("Tr.") 11:7-15.

conditions, and enjoining them from arresting him for civil immigration detention purposes.[9]  In the alternative, he requests a bond hearing before this Court.[10]

This case presents the question whether, when an immigration detainee suffering from prolonged detention receives a bond hearing under the Second Circuit's decision in *Black v. Decker* and an immigration judge authorizes bond, the Government may unilaterally or on an essentially *ex parte* basis obtain a stay of the immigration judge's decision for an indeterminate period of time, without any opportunity for the detainee to be heard beforehand.  For the reasons set forth below, the Court concludes that the answer is no.  It therefore **GRANTS** J.M.P.'s Motion in part and **ORDERS** Respondents to release him subject to the conditions set by the IJ at the bond hearing.

## BACKGROUND

### I.    Factual and Procedural Background[11]

#### A.    Petitioner's History

Petitioner J.M.P. is a 23-year-old from El Salvador.  *See* Pet. Writ of Habeas Corpus ("Petition") ¶ 26, ECF No. 1.  Growing up in El Salvador, he was regularly harassed and assaulted by gang members who demanded money or assistance from him.  *Id.*  After repeatedly resisting pressure to join the gangs, he eventually became a target.  *Id.*  When J.M.P. was a teenager, gang

---

[9] App. at 2.

[10] *Id.*

[11] The Court previously recounted much of the factual background of this case in its Opinion and Order dated September 10, 2025, *see J.M.P.*, 2025 WL 2614688, and repeats those facts here for ease of reference.  The Court's account of the facts draws on the allegations in the Petition and related filings, which Respondents do not contest.  The Court assumes these facts to be true for purposes of this opinion but reserves the right to test those facts in further evidentiary proceedings.  *See* 28 U.S.C. § 2248 ("The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true.").

members extorted him and his family's bakery for money; he "paid because [he] had no choice." *Id.* ¶ 31 n.2. Under threat of violence, J.M.P. gave Mara Salvatrucha ("MS-13") members small amounts of money—equivalent to around $25—on a few occasions. *Id.* ¶ 31 & n.2.

When he was around 14 years old, J.M.P. was physically attacked by several gang members and ended up in the hospital. *Id.* ¶ 26; *see* Letter of Correction, ECF No. 13. At the hospital, he learned he was under arrest. Pet. ¶ 26. He was charged with attempted aggravated homicide, resisting arrest, and gang affiliation in El Salvador. *See* Letter of Correction. As described by J.M.P.'s counsel, "[t]he alleged incident leading to these charges was a group of young people exchanging gun fire with two police officers. No one was injured." *Id.* J.M.P. "was tried as a minor and was found guilty of attempted aggravated homicide and resisting arrest; the gang affiliation charge was dismissed." *Id.* "He received a sentence of one and a half years and served 14 months at a juvenile rehabilitation facility" in El Salvador called Sendero de Libertad. *Id.* J.M.P. subsequently moved to another city in El Salvador for his safety, but the threats and violence from gangs continued. Pet. ¶ 27. In 2020, when J.M.P. was approximately 18 years old, he fled to the United States to escape the pressure, threats, and violence from gangs. *Id.* While in the United States, J.M.P. has lived a quiet life. *Id.* Prior to his detention by ICE, he worked, lived with his father, and spent time with family in the United States. *Id.* ¶ 48. He has never been prosecuted for a crime while in the United States; until January 2025, he had never been arrested in the United States. *Id.* ¶ 27; ECF No. 14-1 at 2 ("Subject has no criminal history").

### B.    Petitioner's Arrest, Detention, and Removal Proceedings

On January 28, 2025, J.M.P. was arrested by agents from the Drug Enforcement Administration ("DEA"). Pet. ¶ 28; DEA Report of Investigation, Second Morrow Decl. Ex. B ("Emergency Stay Mot.") at 29-32, ECF No. 24-2. On January 29, 2025, after no criminal charges were filed, the DEA turned him over to ICE. Pet. ¶ 29. His father was arrested the same day and

placed in ICE custody. *Id.* ¶ 48; Reply Mem. Supp. Pet. Writ of Habeas Corpus ("Habeas Reply") at 3, ECF No. 17.

ICE charged J.M.P. with removability under the Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i) (presence in the United States without being admitted or paroled), and placed him in removal proceedings at the Varick Street Immigration Court in New York, NY. *See* ECF No. 14-2 at 1. When ICE questioned him about any affiliation with gangs or terrorist organizations, he stated he was not affiliated with any such organizations. *See* ECF No. 14-1 at 3. ICE has detained J.M.P. at Orange County Jail since January 29, 2025. *See* ECF No. 15 ¶ 8.

On March 4, 2025, J.M.P. requested a custody redetermination, which was scheduled for March 11, 2025. ECF No. 15 ¶¶ 12-13. On March 10, 2025, however, DHS filed a RAP sheet in the bond record showing the criminal charge in El Salvador, and J.M.P.'s removal counsel withdrew the request for a custody determination. Pet. ¶ 30. On March 11, 2025, J.M.P. submitted a motion to suppress and terminate his removal proceedings. *Id.* The Immigration Court denied that motion on March 19, 2024. *See* ECF No 15 ¶ 14.

On March 31, 2025, J.M.P. filed his Form I-589 application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Habeas Reply at 3; *see* Pet. ¶ 31 & n.2. On May 13, 2025, J.M.P. had an individual merits hearing on his Form I-589 application. *See* Pet. ¶ 31; Habeas Reply at 3-4. Before going on the record, the immigration judge stated that J.M.P. was subject to mandatory detention due to providing "material support to a terrorist organization," presumably under the Terrorism-Related Inadmissibility Grounds, or the "TRIG" bar, [12] by giving MS-13 members small amounts of money on two or three occasions when

---

[12] 8 U.S.C. § 1226(c)(1) provides for mandatory detention of any noncitizen who "is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title."

he was a minor in El Salvador.  Pet. ¶ 31.  By oral decision that day, the immigration judge denied J.M.P.'s application for relief and ordered him removed.  *Id.*; Habeas Reply at 4.  On May 16, 2025, J.M.P. filed a motion asking the immigration judge to clarify which statutory authority he was detained under and, if he were eligible, to schedule a bond hearing.  Habeas Reply at 4; Pet. ¶ 32.  No decision on that motion had issued as of August 22, 2025.  *See* Habeas Reply at 4.

On June 11, 2025, J.M.P. timely appealed the removal order and denial of his Form I-589 application to the BIA; the immigration court's merits decision is therefore not final.  Pet. ¶ 33; Habeas Reply at 4.  As of August 22, 2025, no briefing schedule had yet been issued on the merits appeal.  *See* Habeas Reply at 4.

After their detention by ICE, J.M.P. and his father lost the home they had lived in for several years, along with most of their possessions, which were discarded after their arrest.  Pet. ¶ 48.  J.M.P.'s detention has prevented him from financially supporting his family in the United States and in El Salvador.  *Id.*; Habeas Reply at 4.  J.M.P. has now been detained for nearly nine months.  *See* Pet. ¶ 48.

### C.    This Court's Grant of Habeas Relief

On September 10, 2025, this Court granted J.M.P.'s habeas petition in part, holding that his detention—which at that point had persisted for more than seven months—had become unreasonably prolonged, and that, under the Second Circuit's decision in *Black v. Decker*, 103 F.4th 133 (2d Cir. 2024), due process required him to be provided an individualized bond hearing at which the Government would bear the burden of proving by clear and convincing evidence that

---

8 U.S.C. § 1226(c)(1)(D).  Sections 1182(a)(3)(B) and 1227(a)(4)(B), in turn, describe noncitizens who "engage" in "terrorist activities," which includes providing material support for terrorism under Section 1182(a)(3)(B)(iv)(VI).  These are known as the Terrorism-Related Inadmissibility Grounds, or the "TRIG bar."  Pet. ¶ 13.

his continued detention was justified.  Op. & Order ("September 10 Order"), ECF No. 19; *J.M.P.*,
2025 WL 2614688.  In *Black v. Decker*, the Second Circuit held that, while due process does not
require an initial bond hearing for noncitizens subject to mandatory detention under 8 U.S.C.
§ 1226(c), such detention might nevertheless become unreasonably prolonged so as to necessitate
"additional procedural protections," such as a bond hearing.  *Id.* at 145.  The Second Circuit further
held that due process challenges to prolonged detention under § 1226(c) should be reviewed under
the analysis set forth by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which
takes into consideration: (i) the private liberty interest affected, (ii) the risk of erroneous
deprivation of that interest and the probable value of additional procedural safeguards, and (iii) the
government's interest, including the function involved and the burdens that additional procedural
requirements would create.  *Black*, 103 F.4th at 147.  Evaluating each of the *Mathews* factors in
J.M.P.'s case and following the Second Circuit's guidance in *Black*, the Court concluded that
J.M.P. was entitled to a bond hearing at which the Government bore the burden of showing the
need for his continued detention.  *J.M.P.*, 2025 WL 2614688, at *3-5.  The Court ordered the
Government to provide J.M.P. such a hearing by September 25, 2025, or to release him from
detention if such a hearing was not provided.  *Id.* at *5.

    **D.**    **The Bond Hearing and Grant of Release on Bond**

    On September 19, 2025, Immigration Judge ("IJ") Francisco Prieto held a bond hearing
pursuant to this Court's September 10 Order.  *See* App. Ex. B ("Form Bond Order"), ECF No. 20-
2; Reply Mem. Supp. OTSC Ex. B ("Bond Tr."), ECF No 26-2.  The IJ began by marking the
evidence, including this Court's September 10 Order; eight exhibits provided by DHS; and eleven
exhibits provided by J.M.P.  Bond Tr. 1:20-4:7.  Other than an objection as to weight, neither party
objected to the evidence submitted.  *Id.*  J.M.P. was present via videoconference, but there was no
Spanish interpreter present.  *Id.* 2:9-10; App. Ex. A ("First Lauterback Decl.") ¶ 4, ECF No. 20-1.

Counsel for DHS presented argument first. *See* Bond Tr. 4:12-5:13. DHS first argued that J.M.P. "is subject to mandatory detention under INA 235(b)(2)(A)" and an immigration judge "lacks authority to redetermine the custody of such aliens" under *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). *Id.* 4:18-19, 4:23-5:2. DHS next argued that J.M.P. is subject to mandatory detention under INA § 236(c) for providing material support to MS-13. *Id.* 5:2-8. DHS then concluded by stating, "it is our position that under both the BIA decision and [] 236(c), [J.M.P.] is subject to mandatory detention." *Id.* 5:11-13. DHS did not directly address whether J.M.P. would present a danger to the community or a flight risk if released.

Counsel for J.M.P. presented next. *Id.* 5:15-9:23. Counsel explained that this Court had already acknowledged that J.M.P. was subject to mandatory detention but nevertheless held that "to detain him without the opportunity for an individualized bond hearing would be unconstitutional." *Id.* 5:21-23, 6:4-6. Counsel explained that, pursuant to this Court's order, the burden was on the government to prove future dangerousness or flight risk by clear and convincing evidence. *Id.* 5:23-25, 6:2-3. Counsel next explained that DHS had not met its burden on dangerousness, noting that "the Government has presented documents from their own databases showing that [J.M.P.] has no criminal history in the United States." *Id.* 6:6-10. Counsel next detailed J.M.P.'s mitigating evidence in the event the IJ believed DHS had met its burden. *Id.* 6:15-7:6. Included in J.M.P.'s mitigating evidence was a notarized letter from J.M.P.'s aunt stating that the family is suffering with J.M.P. detained and that J.M.P. would live with her in Queens, New York upon his release. First Lauterback Decl. ¶ 7; App. Ex. D ("Letters of Support") at 1-2, ECF No. 20-4. Also included was a notarized letter from the president of a synagogue in Queens, New York in support of J.M.P. First Lauterback Decl. ¶ 7; Letters of Support at 9. The letter explained that J.M.P. had volunteered with the synagogue for four years, spending his weekends helping with "food drives, youth sports programs, maintenance projects, and much more." First

Lauterback Decl. ¶ 7; Letters of Support at 9.  The letter stated that the synagogue community would support J.M.P., including with finding a place to stay if needed, upon his release.  First Lauterback Decl. ¶ 7; Letters of Support at 9.  Also included in the evidence were four additional notarized letters of support from family and friends detailing J.M.P.'s dependable nature, his good character, and his contributions to his community and neighborhood.  First Lauterback Decl. ¶ 7; Letters of Support at 4-8, 10-11.

Counsel for J.M.P. next turned to risk of flight, explaining that DHS had not met its burden to show J.M.P. was a flight risk.  Bond Tr. 7:15-21.  Counsel also detailed J.M.P.'s mitigating evidence should the IJ conclude that DHS had met its burden on flight risk.  *Id.* 7:21-9:23.  Specifically, counsel explained that "he is represented by counsel[,] which alone nearly guarantees that he will continue to appear for his case," and pointed to statistics entered into evidence in the bond record.  *Id.* 7:21-25.  Counsel further argued that the support of J.M.P.'s community and the fact that his case is on appeal mitigated any risk of flight.  *Id.* 8:2-11.  Finally, Counsel explained that the IJ must consider alternatives to detention and ability to pay, and presented evidence about J.M.P.'s indigence.  *Id.* 8:11-9:11.

DHS counsel was given the opportunity to respond.  *Id.* 9:24-25.  DHS counsel explained that J.M.P. had been ordered removed, stating that this "alone is a strong reason for [him] to be a high flight risk" and could not be mitigated by his community ties.  *Id.* 10:11-16.  DHS counsel then stated that "the lack of criminal activity . . . is not an indication . . . that he has been rehabilitated here in the United States simply because he does not have a criminal past."  *Id.* 10:16-20.  DHS counsel argued that J.M.P. was a danger and flight risk because J.M.P. gave $25 several times to MS-13 when he was under 14 years old, and because of "the circumstances of how he came into the ICE custody, where DEA was involved."  *Id.* 10:22-11:3, 11:10-13.  DHS

acknowledged that the DEA did not charge him with a crime but stated, that "does not mean that he was not involved in activity that was in violation of the . . . United States laws." *Id.* 11:15-18.

When DHS counsel finished presenting, the IJ asked her to respond to J.M.P.'s argument that *Matter of Yajure Hurtado* did not apply because "the District Judge that set this order knows that law and wanted him to have a bond request regardless." *Id.* 11:23-12:4. DHS counsel stated that this Court had "deviated from the BIA's decision" and "the reasoning behind *Yajure Hurtado* still remains." *Id.* 12:15, 13:2-3. The IJ then asked, "So you're saying the district court has to follow the Board?" Counsel for DHS responded, "Yes, Judge." *Id.* 13:4-6.

Counsel for J.M.P. was given an opportunity to respond and reiterated that the purpose of the custody hearing was not to determine whether J.M.P. was subject to mandatory detention but to determine whether DHS had met its burden to prove that J.M.P. was a danger or flight risk. *Id.* 13:17-14:13. Counsel then argued that DHS had not met its burden and that J.M.P. had presented sufficient mitigating evidence. *Id.* 14:13-15:15. The IJ then asked DHS counsel if she would like to make any additional arguments, and she stated that she had nothing to add. *Id.* 15:16-20.

The IJ then made an oral ruling granting J.M.P.'s release under $15,000 bond, explaining why DHS had not met its burden on danger or flight risk and detailing the mitigating factors adduced at the hearing. *Id.* 16:7-23:2. First, the IJ found that DHS had not met its burden to prove J.M.P. was a danger to the community. *Id.* 17:7-18:12. Although DHS had not presented argument about J.M.P.'s criminal conviction in El Salvador, the IJ noted:

> [T]he Court will note that it is not part of this record proceeding, but the Court . . . can notice what's in removal proceedings where the Respondent was charged with an attempted homicide when he was approximately a teenager in El Salvador, approximately nine to ten years ago. The Respondent was—had a gang affiliation charge dismissed, and he was sentenced to approximately a year and a half in jail. He has no other criminal history in El Salvador; he has no criminal history here in the United States.

*Id.* 17:9-21.  The IJ discussed several mitigating factors in J.M.P.'s case, including his young age

at the time of his criminal arrest in El Salvador, the decade that had passed since then, and his lack

of criminal history in the United States.  *Id.* 17:7-18:12.

The IJ then discussed flight risk.  The IJ first acknowledged that J.M.P.'s request for relief

from removal was denied by another immigration judge and was on appeal, and that he had not

shown that he has family ties in this country that could lead to a form of relief from removal, and

found that these facts indicated that there was some risk of flight.  *Id.* 20:6-22:9.  But the IJ also

found that J.M.P. had provided some evidence of his community ties and volunteerism that

mitigated flight risk.  *Id.* 22:10-17.  The IJ then stated that flight risk could be ameliorated by a

high bond of $15,000.  *Id.* 22:17-23:2.  The IJ also issued a form order memorializing the bond

decision, checking off boxes that together stated: "Granted. It is ordered that Respondent be:

released from custody under bond of $15,000.00."  Form Bond Order.

In a written order issued later, on September 29, 2025, the IJ summarized his findings as

follows:

### a. Danger to the Community

The Court finds that the Department failed to meet its burden to demonstrate that
the Respondent presents a continuing danger to the community. In support of its
position as to dangerousness and flight risk, the Department submitted a Form I-
213, a DHS arrest warrant, a Drug Enforcement Agency ("DEA") report of
investigation, and an FBI rap sheet. *See* Exh. B2. The Court notes that these
submissions reveal that the Respondent has no criminal history during his five years
in the United States. *Id.*

The Department argues that because the Respondent was subject to mandatory
detention due to providing material support to a terrorist organization, he is
accordingly a danger to the community. They are mistaken. The Respondent does
not contest that he gave MS-13 members small amounts of money on "two or three
occasions" when he was a minor in El Salvador. Exh. B1 at 4. However, the coerced
and *de minimis* nature of the payments made to the gang many years ago, though
relevant to *statutory* inadmissibility, nevertheless support his release on bond
because they do not suggest any danger to the community here in the United States.
The Court further notes that the Respondent was about 14 years old, he was charged

11

with attempted aggravated homicide in El Salvador after being physically attacked by several gang members. Exh. Bl at 2. Ultimately, the Respondent was found guilty and served 14 months' incarceration. *Id.* The Court, while not minimizing the seriousness of this incident, notes that it that occurred when the Respondent was a child and in which he was the only one injured does not render the Respondent a danger to the community a decade later.

Additionally, the Respondent has significant mitigating factors, including dedicating his weekends to food drives, youth sports programs, and maintenance projects with the Beth Gabriel Jewish Center, an Orthodox synagogue in Queens. Members of this congregation provided letters of support, singing the praises of the Respondent's "cheerful," "hardworking," and "dependable" nature, describing him as "beloved by staff and participants alike," and offering that "our community will help him find a place to stay if he needs it. His contribution is irreplaceable." Exh. B2 at 15.

**b. Flight Risk**

The Court finds that the Department failed to meet its burden to demonstrate, by clear and convincing evidence, that the Respondent presents a high flight risk that cannot be mitigated by reasonable conditions of supervision or monetary bond. Indeed, the Department failed to submit any evidence to support a finding of the Respondent being a flight risk. Absent any corroborative evidence, the Court notes that the Respondent entered the United States illegally without being inspected by an immigration officer at a designated port of entry, circumstantial evidence that the Respondent would disregard immigration laws and may fail to appear in the future. *See* Exh. B2 at 7. However, the Court notes that the Respondent, has factors that weigh in his favor, most notably the absence of any criminal history or history evading legal processes in the United States. Though the Respondent did enter the United States illegally, he has consistently appeared for his immigration proceedings. The Court also notes that, as discussed *supra*, the Respondent has strong community ties in the United States, which further mitigate the risk that he would flee. Specifically, in addition to the synagogue's earlier discussed offer of support, the Respondent's aunt provided a notarized letter affirming that the Respondent will reside with her in Queens upon his release. Exh. B2 at 1-2.

Based on all the evidence in the record, the Court finds that the Respondent has met his burden of establishing he is not a flight risk, and that any flight risk concerns can be mitigated by the Respondent posting bond in the amount of $15,000.

Mem. Order of the IJ ("Written Bond Order") at 3-5, ECF No. 27-1.

### E.    The Automatic Stay and Order to Show Cause

The bond hearing ended at approximately 1:39 p.m. on September 19, 2025.   First Lauterback Decl. ¶ 15.  At approximately 1:57 p.m., the Envision Freedom Fund sent a bond

payment request through cebonds.ice.gov, expressing intent to pay the $15,000 bond on behalf of J.M.P.  *Id.* ¶ 15; App. Ex. E, ECF No. 20-5.

At approximately 2:59 p.m., DHS filed Form EOIR-43, Notice of ICE Intent to Appeal Custody Redetermination, invoking an automatic stay pursuant to 8 C.F.R § 1003.19(i)(2) of the IJ's bond order.  *See* App. Ex. C, ECF No. 20-3.  In the Form EOIR-43, DHS was not required to articulate any basis for the stay or make any individualized, fact-specific arguments regarding the need to preserve the status quo.  *See id.*; Sep. 29, 2025 Hr'g Tr. ("Tr.") 6:12-20.  There is nothing in the record that indicates why the decision to seek the automatic stay was made.  *See* Tr. 6:21-25.  As the Government explained, "[t]he automatic stay is essentially triggered by DHS checking a box on its EOIR-43 form."  Tr. 6:25-7:1.  The next day, on September 20, 2025, the request to pay J.M.P.'s bond was denied with the explanation: "[DHS] has filed an E-43 with a stay."  App. Ex. F, ECF No. 20-6.

On September 23, 2024, J.M.P. filed an application for an order to show cause, temporary restraining order, and preliminary injunction (the "Motion") in this Court.  *See* App.  In his application, he informed the Court of the bond hearing before the IJ, the IJ's order granting release on bond, and DHS's invocation of the automatic stay pursuant to 8 C.F.R. § 1003.19(i)(2).  *See* Mem. Supp. Mot. TRO ("Pet'r Mem.") at 3-5, ECF No. 21.  He explained that the automatic stay provision, "formerly only invoked in limited, exceptional circumstances, is now being used indiscriminately by DHS."  *Id.* at 11 (citing Stacy L. Brustin, *A Civil Shame: The Failure to Protect Due Process in Discretionary Immigration Custody & Bond Redetermination Hearings*, 88 Brook. L. Rev. 163, 197 n.231 (2022)).  Citing more than a dozen[13] district court decisions issued over the preceding few months finding DHS's use of the automatic stay provision unconstitutional, he

---

[13] As explained *infra*, this number has now doubled.  *See infra* note 20.

argued that his continued detention pursuant to that provision violated his procedural and substantive due process rights. *Id.* at 11-12.

Later that day, the Court issued an Order to Show Cause directing the Government to respond to J.M.P.'s Motion by September 25, 2025; allowing Petitioner to file any reply by September 26, 2025; and setting a hearing for September 29, 2025. *See* O.S.C., ECF No. 22.

### F.    The Discretionary Stay

The Government filed its opposition on September 25, 2025, as directed, and J.M.P. filed a reply on September 26, 2025. *See* Resp'ts Mem. Opp'n Mot. TRO ("Gov't Opp'n"), ECF No. 23; Pet'r's Reply Mem. Supp. Mot. TRO ("Reply"), ECF No. 26. In those filings, the parties informed the Court of several developments that occurred after J.M.P. filed his Motion on September 23, 2025.

On September 24, 2025, at 2:29 p.m., DHS filed a notice of appeal of the IJ's bond order to the BIA. Second Morrow Decl. Ex. A ("Notice of Appeal"), ECF No. 24-1; *see* Tr. 4:22-5:1. Counsel for J.M.P. received notice of this filing at 3:16 p.m. through the Executive Office of Immigration Review ("EOIR") electronic filing system. Second Lauterback Decl. ¶ 3, ECF No. 26-1; Reply Ex. C, ECF No. 26-3. Counsel for J.M.P. entered her appearance in the BIA bond record at 3:17 p.m. Second Lauterback Decl. ¶ 3; Reply Ex. D, ECF No. 26-4.

At 3:26 p.m., DHS filed a notice with the BIA stating that "upon further review, ICE has decided to withdraw the Form EOIR-43," and stating that the "withdrawal of said notice dissolves the [automatic] stay." Second Morrow Decl. Ex. C, ECF No. 24-3.

At 3:28 p.m., DHS filed with the BIA an "Emergency Motion to Stay Custody Redetermination." Emergency Stay Mot. DHS argued that the IJ had erred in granting J.M.P.'s release on bond for three reasons: (1) "because the respondent poses a danger to the community, as evidenced by his criminal history and ties in El Salvador and the United States"; (2) because he

"presents a significant flight risk that cannot be mitigated by the bond set"; and (3) "because the respondent is present without admission or parole and, as such, is an arriving alien not eligible for bond under 8 C.F.R. § 1003.19(h)(2)(i)(B)." *Id.* at 11.[14]  DHS therefore "request[ed] that the Board stay the order of the Immigration Judge pursuant to 8 C.F.R. § 1003.19(i)(1) pending the Board's adjudication of DHS's appeal of the Immigration Judge's custody decision." *Id.*

DHS attached to the Emergency Stay Motion the Notice of Appeal it had filed an hour earlier; the Form Bond Order (in which the IJ had checked a box stating that J.M.P. was to be "released from custody under bond of $15,000.00"); and three of the eight exhibits DHS had presented in the bond hearing: the Notice to Appear ("NTA"); an FBI RAP sheet; and the DEA Report of Investigation. *See id.* at 1-9, 18-19, 20-23, 24-28, 29-32.  DHS did not enclose with the Emergency Stay Motion a transcript of the hearing, any other record of the IJ's reasoning (at this point the written decision had not yet issued), or any of J.M.P.'s exhibits.  *See* Tr. 10:4-7; Third Lauterback Decl. ¶ 7, ECF No. 29-1.

At approximately 3:29 p.m., counsel for J.M.P. received notice of the Emergency Stay Motion and immediately began working on an opposition.  Second Lauterback Decl. ¶ 5.  At approximately 3:32 p.m., Envision Freedom Fund submitted a request to post bond and received an automatic reply that the "bond payment request was submitted after hours" and that "ICE will conduct a review for this request when business hours resume."  Reply Ex. E, ECF No. 26-5.

At 5:29 p.m.—just two hours after DHS filed its Emergency Stay Motion, and before receiving a response from J.M.P.—the BIA issued an order granting the discretionary stay.  The three-sentence order was issued by a single member of the BIA and stated, in full:

---

[14] Because the filing at ECF No. 24-2 contains multiple documents, the court cites to the ECF page numbers.

> The Department of Homeland Security (DHS) has filed a motion for an emergency stay of the Immigration Judge's bond order, issued on September 19, 2025, ordering the respondent released from custody upon posting a bond of $15,000. After consideration of all information, the Board has concluded that the motion for emergency stay of the bond order will be granted.
>
> ORDER: The motion for stay of execution of the bond order is granted.

Second Morrow Decl. Ex. D ("BIA Stay Order") at 2, ECF No. 24-4. Other than a statement that the Board's decision was based on "consideration of all information," the BIA Stay Order did not contain any individualized discussion of the facts of J.M.P.'s case. *See id.*

At 9:44 p.m., counsel for J.M.P. filed a motion to reconsider the BIA's decision granting the discretionary stay. Second Morrow Decl. Ex. E ("Mot. Recons."), ECF No. 24-5. J.M.P. argued that "[b]ecause the Board did not account for [J.M.P.] to be heard on this motion and ruled despite counsel's appearance in the case, its decision to order DHS's requested relief was in violation of due process and must be reconsidered." Mot. Recons. at 2-3. J.M.P. also argued that although "there is no caselaw articulating factors relevant to a BIA stay in the bond context," DHS should have had to satisfy the traditional stay factors outlined in *Nken v. Holder*, 556 U.S. 418, 433-34 (2009) (articulating the stay factors as (1) a likelihood of success on the merits; (2) "whether the applicant will be irreparably injured absent a stay"; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies). Mot. Recons. at 3. J.M.P. further argued that DHS had not met its burden on the stay factors and had misstated the record in its Emergency Stay Motion. *Id.* at 3-6

On September 25, 2025, the second request to post bond for J.M.P. was denied with the comment: "The BIA granted a motion for a stay." Reply Ex. F, ECF No. 26-6. J.M.P. therefore remains detained.

On October 1, 2025, DHS filed an opposition to J.M.P.'s motion for reconsideration of the BIA's discretionary stay order. Third Lauterback Decl. Ex. C ("Recons. Opp'n"), ECF No. 30-

1.[15]  In its opposition, DHS argued, *inter alia*, that J.M.P.'s motion was "a pre-emptive merits brief disguised as a motion to reconsider," and that the BIA should not consider it.  Recons. Opp'n at 3.  DHS urged that "[a]llowing respondents to relitigate stay determinations through motions to reconsider would undermine the Board's ability to manage its docket and would invite serial motion practice in every case where a stay is granted."  *Id.*

The motion for reconsideration remains pending, and the Government is unaware of any timeline for its resolution.  *See* Tr. 15:18-19.

### G.    Procedural History[16]

As described above, J.M.P. filed his application for an order to show cause, temporary restraining order, and preliminary injunction on September 23, 2025, arguing, *inter alia*, that DHS's use of the automatic stay procedure in his case was unconstitutional.  *See* Pet'r Mem.  After the Court set a briefing schedule, the Government submitted an opposition on September 25, 2025, arguing that to the extent J.M.P.'s Motion sought enforcement of this Court's prior order, the motion should be denied because the Government had fully complied with the order by granting J.M.P. a bond hearing.  *See* Gov't Opp'n. at 7.  The Government further argued that J.M.P.'s challenge to the automatic stay was arguably moot given the changed circumstances (i.e., the replacement of the automatic stay with a discretionary one) and that, in any event, J.M.P. had not established a due process violation.  *Id.* at 2 & n.1, 8-15.  J.M.P. filed a reply on September 26, 2025, arguing that his challenge to the automatic stay provision remained live and that the issuance

---

[15] Counsel for J.M.P. inadvertently omitted Exhibit C when filing the supplemental brief but submitted it with a letter to the Court the following business day.  *See* Letter, ECF No. 30.

[16] The procedural history before September 23, 2025 is described in the court's September 10 Opinion.

of the discretionary stay also violated due process because it deprived J.M.P. of the opportunity to be heard and lacked any adjudication standards. *See* Reply at 10-14.

On September 29, 2025, the Court held a hearing on J.M.P.'s Motion. During the hearing, the Court asked the parties to clarify the timeline and sequence of events before the IJ and BIA, and confirmed that were no factual disputes between the parties. *See* Tr. 3:3-17:3. The Court then heard argument from each side. *See* Tr. 17:4-36:17. At the conclusion of the hearing, the Court stated that further briefing would be helpful given the recent change in circumstances, and directed the parties to submit supplemental briefs on the effect of the discretionary stay on October 3, 2025. *See* Tr. 37:1-38:15.

The Government's supplemental brief argued that J.M.P.'s challenge to the automatic stay is moot and that the discretionary stay does not raise due process concerns. *See* Resp'ts' Suppl. Mem. Opp'n Mot. TRO ("Gov't Suppl. Br."), ECF No. 28. J.M.P.'s supplemental brief elaborated on his argument that the discretionary stay process in this case violates due process and reiterated his request for release as the remedy. *See* Pet'r's Suppl. Br. Supp. Mot. TRO ("Pet'r Suppl. Br."), ECF No. 29. The Motion is now fully briefed.

## H.    Legal Framework

A brief history of the regulations governing stays of bond determinations is helpful to the Court's decision today. *See Günaydın v. Trump*, 784 F. Supp. 3d 1175, 1182-84 (D. Minn. 2025). Section 236(a) of the INA, codified at 8 U.S.C. § 1226(a), confers discretion to the Attorney General and DHS to make certain decisions as to the detention and bond of noncitizens in removal proceedings.[17] If an immigration judge finds that a noncitizen is eligible for bond, DHS may

---

[17] Although the statute refers only to the Attorney General, the Homeland Security Act of 2002 transferred most immigration enforcement and administrative functions to the Secretary of Homeland Security. *See* Pub. L. No. 107-296, 116 Stat. 2135 (2002).

appeal the decision of the immigration judge to the BIA.  8 C.F.R. § 1003.19(f).  The regulations further permit DHS to "seek a discretionary stay (whether or not on an emergency basis) from the Board in connection with such an appeal at any time."  *See* 8 C.F.R. § 1003.19(i)(1).  The regulations also provide DHS with the unilateral authority to automatically stay an immigration judge's bond order and keep the person who was granted bond detained pending DHS's appeal to the BIA.  *See* 8 C.F.R. § 1003.19(i)(2).

Prior to 2001, noncitizens who were granted bond by an immigration judge remained detained only if the BIA granted a request to stay the bond order.  *See, e.g.*, 8 C.F.R. § 3.19(i)(2) (1998) (permitting the use of automatic stays only where the noncitizen was subject to a mandatory detention statute).  But following the terrorist attacks of September 11, 2001, the Immigration and Naturalization Service ("INS") (an agency whose functions now fall under DHS) promulgated an interim rule to expand its authority to issue automatic stays to prevent noncitizens' release pending appeal.  *See* Executive Office for Immigration Review, Review of Custody Determination, 66 Fed. Reg. 54909, 54910 (Oct. 31, 2001).  For circumstances in which the INS was previously required to seek an emergency stay from the BIA to prevent the effectuation of an immigration judge's order for release on bond, the new rule allowed the INS to unilaterally invoke an emergency stay at its own discretion to prevent release in any case where it determined that a noncitizen should not be released or when bond had been set in the amount of $10,000 or more.  *Id.*  The INS emphasized that the stay was intended to be "a limited measure," to be used only "where the Service determines that it is necessary to invoke the special stay procedure pending appeal."  *Id.*

In the early 2000s, several federal district courts concluded that the automatic stay provision violated the due process rights of noncitizens.  *See Ashley v. Ridge*, 288 F. Supp. 2d 662, 675 (D.N.J. 2003) (on a petition for writ of habeas corpus, concluding that "the continued detention of Petitioner without judicial review of the automatic stay of the bail determination, despite the

Immigration Judge's decision that he be released on bond, violates Petitioner's procedural and substantive due process constitutional rights"); *Bezmen v. Ashcroft*, 245 F. Supp. 2d 446 (D. Conn. 2003) (holding that ongoing detention pursuant to automatic stay violated due process); *Zabadi v. Chertoff*, No. 05 Civ. 1796, 2005 WL 1514122 (N.D. Cal. June 17, 2005) (same); *Zavala v. Ridge*, 310 F. Supp. 2d 1071 (N.D. Cal. 2004) (same); *Kambo v. Poppell*, No. 07 Civ. 800, 2007 WL 3051601 (W.D. Tex. Oct. 18, 2007) (same). *But see Pisciotta v. Ashcroft*, 311 F. Supp. 2d 445, 455-56 (D.N.J. 2004) (denying habeas petition and stating that "detention pursuant to the automatic stay regulation will not, and should not, be indefinite").

In 2006, the Department of Justice promulgated the final rule. *See* Executive Office for Immigration Review, Review of Custody Determination, 71 Fed. Reg. 57873 (Oct. 2, 2006). The final rule included the language of the interim rule, with some important changes. First, "to allay possible concerns that in some case the automatic stay might be invoked . . . without an adequate factual or legal basis," the final rule added a requirement that the decision to invoke an automatic stay "will be subject to the discretion of the Secretary [of DHS]," and a senior legal official at DHS must certify that "there is factual and legal support justifying the continued detention." *Id.* at 57874.

Second, while the final rule attempted to impose some time limitations, the automatic stay regulations allow for the automatic stay to be extended and detention to continue well beyond ninety days. *Id.* at 57874. "DHS may seek a discretionary stay pursuant to 8 CFR 1003.19(i)(1) to stay the immigration judge's order in the event the Board does not issue a decision on the custody appeal within the period of the automatic stay." 8 C.F.R. § 1003.6(c)(5). "If DHS has submitted such a motion and the Board is unable to resolve the custody appeal within the period of the automatic stay, the Board will issue an order granting or denying a motion for discretionary stay pending its decision on the custody appeal." *Id.* If the BIA has not resolved the custody

20

appeal within 90 days and "[i]f the Board fails to adjudicate a previously-filed stay motion by the end of the 90-day period, the stay will remain in effect (but not more than 30 days) during the time it takes for the Board to decide whether or not to grant a discretionary stay." *Id.*

If the BIA rules in a noncitizen's favor on the bond appeal, authorizing release on bond or denying DHS's motion for a discretionary stay, "release shall be automatically stayed for five business days." 8 C.F.R. § 1003.6(d). If, within that five-day stay period, the custody case is referred to the Attorney General pursuant to 8 C.F.R. § 1003.1(h)(1), "the [non- citizen's] release shall continue to be stayed pending the Attorney General's consideration of the case. The automatic stay will expire 15 business days after the case is referred to the Attorney General." *Id.* DHS may request a discretionary stay when referring the case to the Attorney General and "[t]he Attorney General may order a discretionary stay pending the disposition of any custody case by the Attorney General or by the Board." *Id.*

J.M.P. asserts that, generally speaking, prior to this year, absent extraordinary circumstances, when an immigration judge granted a noncitizen bond, that person was released from ICE custody once bond was paid even where DHS appealed the bond decision to the BIA. The automatic stay provision was rarely employed: between 2015 and 2021, the automatic stay provision was used on average only 26 times per year, on a detained population that numbers in the tens of thousands on any given day, with only two cases being subject to the automatic stay in 2021. *See* Brustin, *supra*, at 197 n.231; *ICE Detention Trends*, Vera Inst. of Just. (July 1, 2025), https://www.vera.org/ice-detention-trends [https://perma.cc/7TRM-XVFS]. But as indicated by the dozens of court cases holding the automatic stay provision unconstitutional in the past few months, the automatic stay is apparently now being used with far more frequency.

## LEGAL STANDARDS

The Constitution establishes due process rights for "all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The Fifth Amendment thus entitles noncitizens to due process in removal proceedings and related custody proceedings. *See Black*, 103 F.4th at 143 (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). Courts in this Circuit consider what due process is due to noncitizens in removal proceedings based on the factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976), which include: (1) the individual's private interests; (2) the risk of an erroneous deprivation of the individual's liberty interests; and (3) the government's interest. *Id.* at 147, 151 (citing *Mathews*, 424 U.S. at 335).

To obtain preliminary injunctive relief, a party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008); *see SAM Party of N.Y. v. Kosinski*, 987 F.3d 267, 273-74 (2d Cir. 2021); *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020). The balance of equities and the public interest factors merge in cases against the government. *See Nken*, 556 U.S. at 435. The standards for issuing a temporary restraining order and a preliminary injunction "are identical." *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002).

## DISCUSSION

### I.    Jurisdiction

Federal district courts have jurisdiction to hear habeas petitions by noncitizens in immigration detention. *See Zadvydas*, 533 U.S. at 687. "It is well-settled that a district court can order a petitioner's release" when granting a petition for a writ of habeas corpus. *Phifer v. Warden,*

*U.S. Penitentiary, Terre Haute, Ind.*, 53 F.3d 859, 864 (7th Cir. 1995). Indeed, release "is the very essence of habeas relief." *Id.* But the writ may also be granted conditionally. *See Fernandez Aguirre v. Barr*, No. 19 Civ. 7048, 2019 WL 4511933, at *3 (S.D.N.Y. Sep. 18, 2019). A conditional grant "represent[s] a district court's holding that a constitutional infirmity justifies petitioner's release," but the "conditional nature of the order provides the [government] with a window of time within which it might cure the constitutional error." *Phifer*, 53 F.3d at 862, 864-65; *see also Fernandez Aguirre*, 2019 WL 4511933, at *3; *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 234-35 (W.D.N.Y. 2019); *Rosa v. McCray*, No. 03 Civ. 4643, 2004 WL 2827638, at *4 (S.D.N.Y. Dec. 8, 2004).

A district court retains jurisdiction to review compliance with a conditional grant of the writ of habeas corpus, "that is, to determine whether the Government properly cured the identified constitutional error." *Fernandez Aguirre*, 2019 WL 4511933, at *3 (citing *Leonardo v. Crawford*, 646 F.3d 1157, 1161 (9th Cir. 2011); *Gibbs v. Frank*, 500 F.3d 202, 206 (3d Cir. 2007); *Gentry v. Deuth*, 456 F.3d 687, 692 (6th Cir. 2006); *Phifer*, 53 F.3d at 865). "If the Government fails to cure the error, the court may grant the petition in full and order the Petitioner's release." *Id.* (citing *Gentry*, 456 F.3d at 692; *Phifer*, 53 F.3d at 865; *Hechavarria*, 358 F. Supp. 3d at 243-44; *Rosa*, 2004 WL 2827638, at *4).

The Government appears to suggest that this Court lacks jurisdiction to consider the relief requested because, to the extent the Motion seeks enforcement of this Court's September 10 Order, the Government has already "fully complied" with the Order by holding the requisite bond hearing, such that there is now "nothing to enforce." Gov't Opp'n at 2. The Government also argues that "J.M.P.'s motion for a temporary restraining order or preliminary injunction was predicated entirely on the automatic stay provision, which is no longer operative," rendering his request for relief moot. Gov't Supp. Br. at 1. The Court disagrees on both points. The Motion, whether

interpreted as a motion to enforce the September 10 Order or as a motion for preliminary injunctive relief on the still-live Petition, is properly before the Court because the mere holding of a bond hearing did not afford J.M.P. the full extent of the relief he sought in his Petition. And as to mootness, the dissolution of the automatic stay does not render his challenge to the use of that procedure moot, because DHS first obtained J.M.P.'s continued detention through the automatic stay and it is not absolutely clear that the challenged conduct will not recur.

### A. The Effect of the Bond Hearing

First, contrary to the Government's argument, the Motion can be construed as a motion to enforce the Court's September 10 Order. The Government's argument is based on a formalistic reading of the Court's order to provide J.M.P. a bond hearing, with no consideration of the Court's substantive discussion of J.M.P.'s due process rights and the appropriate remedy in this case. Although J.M.P.'s "rights were likely given full accord in [the bond] hearing[], . . . [t]he provision of these rights . . . [was] effectively rendered meaningless by the implementation of the automatic stay provision." *Ashley*, 288 F. Supp. 2d at 671. The essentially *ex parte* discretionary stay process had the same effect. The point of a bond hearing is not simply to go through the empty motions of a hearing, only for the bond applicant to remain in detention regardless of the immigration judge's decision. "A fair hearing is only 'meaningful' if the results of that hearing are respected, otherwise it is merely a formality with no legal significance. The Government cannot withstand a procedural due process objection by arguing that due process is provided, then given no import." *Id.*

Second, even if the Court's September 10 Order were read to grant a bond hearing as a mere formality with no substantive import, J.M.P.'s Motion is properly before this Court because he has not yet been afforded all the relief he requested in his original Petition—that is, release from detention. *See* Pet. at 19.

Accordingly, because the Motion can be construed as a motion to enforce the judgment, and because the Court has now received full briefing and held argument on the constitutional questions presented, the Court will proceed below to an ultimate determination of the merits rather than analyzing the preliminary injunction factors.[18]

### B. Mootness

The Government urges this Court to ignore the automatic stay entirely, arguing that J.M.P.'s challenge is now moot because the automatic stay has been withdrawn and replaced with a discretionary stay obtained on an emergency basis from the BIA. *See* Gov't Suppl. Br. at 2-3. But the Court agrees with J.M.P. that, under well-established mootness principles, the constitutional concerns raised by the automatic stay are not moot. *See* Pet'r Suppl. Br. at 9. "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). "The voluntary cessation doctrine 'traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior.'" *Neurological Surgery Prac. of Long Island, PLLC v. U.S. Dep't of Health & Hum. Servs.*, 145 F.4th 212, 224 (2d Cir. 2025) (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1 (2001)). "[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the

---

[18] The Court also notes that, because J.M.P. has shown a clear likelihood of success on the merits that his continued detention is unlawful and that he will clearly suffer irreparable harm if his detention is further prolonged, and because the balance of equities and the public interest favor release from unlawfully prolonged detention, a preliminary injunction would also be appropriate. *See Winter*, 555 U.S. at 20.

allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190.

Here, the Government has not disavowed re-invoking the automatic stay provision in J.M.P.'s case. Indeed, when asked if DHS would be able to invoke the automatic stay again if the motion for reconsideration were granted by the BIA, counsel stated that she did not know, but notably did not rule it out. Tr. 27:24-28:4. DHS's voluntary cessation of automatic stay therefore does not moot J.M.P.'s constitutional challenge to it, because it is not "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth*, 528 U.S. at 190.

In fact, there is reason to conclude, as J.M.P. argues, that DHS withdrew the automatic stay in "an effort to insulate their use of the automatic stay provision from judicial review." Reply at 1. It was only after J.M.P. challenged the constitutionality of the automatic stay in this Court, citing an emerging consensus among district courts that the procedure is unconstitutional, that DHS withdrew it. But when asked by this Court why DHS had withdrawn the automatic stay before seeking a discretionary stay, Government counsel stated that she did not know, and acknowledged that in other cases DHS had "waited to withdraw the automatic stay while the motion for a discretionary stay is pending." Tr. 12:10-13:3. Counsel agreed that it was procedurally possible to leave the automatic stay in place pending briefing on a motion for a discretionary stay, Tr. 12:10-13:6, which would appear to be the more logical course for a party wishing to maintain the status quo pending full consideration of an application for a discretionary stay pending appeal. But once the automatic stay was withdrawn, it created an exigency that DHS used to justify emergency consideration of a discretionary stay request, which the BIA then granted quickly—i.e., in approximately two hours, without waiting for a response from J.M.P. The record therefore

suggests that the purpose of withdrawing the automatic stay before obtaining a discretionary one was to ensure that the bond determination remained stayed, while evading this Court's review.

Accordingly, J.M.P.'s challenge to the automatic stay process is not moot; his continued detention is attributable to DHS's invocation and voluntary cessation of the automatic stay. But even looking beyond the automatic stay to consider the entire course of conduct here, the Court's conclusion in this case would not change; as explained below, the discretionary stay process here suffered from the same essential constitutional flaws as the automatic stay.

## II.    Due Process[19]

This Court is persuaded by the unanimous reasoning of district courts across the country and holds that J.M.P.'s continued detention pursuant to the automatic stay deprives him of liberty without due process of law. When J.M.P. first filed his Motion, he cited more than a dozen recent district court decisions concluding that the automatic stay provision in 8 C.F.R. § 1003.19(i)(2) violates or likely violates the due process rights of habeas petitioners ordered released on bond by

---

[19] "Because the procedural and substantive due process inquiries overlap, and because . . . any distinction between the resulting remedies would be 'largely academic in this case,'" the Court does "not separately address substantive due process concerns." *Black*, 103 F.4th at 142 n.12 (citation omitted).

an immigration judge.[20]   Today, that number has doubled.[21]   To the Court's knowledge, since DHS began regularly invoking the automatic stay provision earlier this year, no district court has held that it comports with due process.   *See Vargas Lopez v. Trump*, No. 8:25 Civ. 526, 2025 WL 2780351, at \*10 (D. Neb. Sep. 30, 2025) ("Indeed, no district court has concluded in 2025—that is, since what appears to have been a policy change within the DHS over application of 8 C.F.R. § 1003.19(i)(2)—that the regulation comports with due process.").

---

[20] *See Carlon v. Kramer*, No. 4:25 Civ. 3178, 2025 WL 2624386 (D. Neb. Sep. 11, 2025); *Palma v. Trump*, No. 4:25 Civ. 3176, 2025 WL 2624385 (D. Neb. Sep. 11, 2025); *Perez v. Kramer*, No. 4:25 Civ. 3179, 2025 WL 2624387 (D. Neb. Sep. 11, 2025); *Sampiao v. Hyde*, No. 1:25 Civ. 11981, 2025 WL 2607924 (D. Mass. Sep. 9, 2025); *Martinez v. Noem*, No. 5:25 Civ. 1007, 2025 WL 2598379 (W.D. Tex. Sep. 8, 2025); *Herrera v. Knight*, No. 2:25 Civ. 1366, 2025 WL 2581792 (D. Nev. Sep. 5, 2025); *Carmona-Lorenzo v. Trump*, No. 4:25 Civ. 3172, 2025 WL 2531521 (D. Neb. Sep. 3, 2025); *Fernandez v. Lyons*, No. 8:25 Civ. 506, 2025 WL 2531539 (D. Neb. Sep. 3, 2025); *Perez v. Berg*, No. 8:25 Civ. 494, 2025 WL 2531566 (D. Neb. Sep. 3, 2025); *Leal-Hernandez v. Noem*, No. 1:25 Civ. 2428, 2025 WL 2430025 (D. Md. Aug. 24, 2025); *Jacinto v. Trump*, No. 4:25 Civ. 3161, 2025 WL 2402271 (D. Neb. Aug. 19, 2025); *Maldonado v. Olson*, No. 25 Civ. 3142, 2025 WL 2374411 (D. Minn. Aug. 15, 2025); *Anicasio v. Kramer*, No. 4:25 Civ. 3158, 2025 WL 2374224 (D. Neb. Aug. 14, 2025); *Garcia Jimenez v. Kramer*, No. 4:25 Civ. 3162, 2025 WL 2374223 (D. Neb. Aug. 14, 2025); *Mohammed H. v. Trump*, 786 F. Supp. 3d 1149 (D. Minn. 2025); *Günaydın v. Trump*, 784 F. Supp. 3d 1175 (D. Minn. 2025).

[21] *See Maza v. Hyde*, No. 1:25 Civ. 12407, 2025 WL 2951922 (D. Mass. Oct. 20, 2025); *Merino v. Ripa*, No. 25 Civ. 23845, 2025 WL 2941609 (S.D. Fla. Oct. 15, 2025); *Carlos v. Noem*, No. 2:25 Civ. 1900, 2025 WL 2896156 (D. Nev. Oct. 10, 2025); *Arcos v. Noem*, 4:25 Civ. 4599, 2025 WL 2856558 (S.D. Tex. Oct. 8, 2025); *Casun v. Hyde*, No. 25 Civ. 427, 2025 WL 2806769 (D.R.I. Oct. 2, 2025); *Quispe-Ardiles v. Noem*, No. 1:25 Civ. 1382, 2025 WL 2783800 (E.D. Va. Sep. 30, 2025); *Luna Quispe v. Crawford*, No. 1:25 Civ. 1471, 2025 WL 2783799 (E.D. Va. Sep. 29, 2025); *Alves da Silva v. ICE*, No. 25 Civ. 284, 2025 WL 2778083 (D.N.H. Sep. 29, 2025); *Silva v. Larose*, No. 25 Civ. 2329, 2025 WL 2770639 (S.D. Cal. Sep. 29, 2025); *Singh v. Lewis*, No. 4:25 Civ. 96, 2025 WL 2699219 (W.D. Ky. Sep. 22, 2025); *Hasan v. Crawford*, No. 1:25 Civ. 1408, 2025 WL 2682255 (E.D. Va. Sep. 19, 2025); *Barrera v. Tindall*, No. 3:25 Civ. 541, 2025 WL 2690565 (W.D. Ky. Sep. 19, 2025); *Arce v. Trump*, No. 8:25 Civ. 520, 2025 WL 2675934 (D. Neb. Sep. 18, 2025); *Vazquez v. Feeley*, No. 2:25 Civ. 1542, 2025 WL 2676082 (D. Nev. Sep. 17, 2025); *cf. Campos Leon v. Forestal*, No. 1:25 Civ. 1774, 2025 WL 2694763 (S.D. Ind. Sep. 22, 2025) (holding that automatic stay regulation exceeds congressional delegation of authority to DHS); *B.D.V.S. v. Forestal*, No. 1:25 Civ. 1968, 2025 WL 2855743 (S.D. Ind. Oct. 8, 2025) (same).

In holding the automatic stay provision unconstitutional, many courts have observed that it "permits an agency official who is also a participant in the adversarial process to unilaterally override the immigration judge's decisions," a procedure that is "anomalous in our legal system." *Günaydın*, 784 F. Supp. 3d at 1187; *see also, e.g.*, *Vazquez v. Feeley*, No. 2:25 Civ. 1542, 2025 WL 2676082, at *19 (D. Nev. Sep. 17, 2025). Accordingly, these courts have had little difficulty concluding that "[t]he risk of erroneous deprivation of a noncitizen's liberty interest when DHS invokes the automatic stay is extraordinarily high." *Vazquez*, 2025 WL 2676082, at *19.

But even if the constitutional infirmities of the automatic stay process alone were insufficient to grant J.M.P. relief, the Court would reach the same conclusion after considering the entire sequence of events, including the original invocation of the automatic stay and the later grant of a discretionary stay. As explained below, the Court concludes that the discretionary stay process in this case presents the same due process concerns as those identified in cases where the automatic stay was held unconstitutional. Just as the automatic stay was issued unilaterally, the discretionary stay was effectively unilateral as well: it was granted within just two hours, essentially on an *ex parte* basis. Like the automatic stay, the discretionary stay was issued without any indication of an individualized assessment of the need for a stay—indeed, because the BIA had no record of the IJ's reasoning or any of J.M.P.'s exhibits when it granted the stay, it necessarily could not have conducted an individualized assessment of all the circumstances of the case. The "discretionary" stay here was essentially automatic in all respects other than its name.

The Court now turns to the *Mathews v. Eldridge* analysis, considering in more detail (i) the private liberty interest affected, (ii) the risk of erroneous deprivation of that interest and the probable value of additional procedural safeguards, and (iii) the Government's interest, including the function involved and the burdens that additional procedural requirements would create. *Black*, 103 F.4th at 147.

A.    **The Private Interest**

Here, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez v. Decker*, 978 F.3d 842, 851 (2d Cir. 2020) (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). "Case after case instructs us that in this country liberty is the norm and detention 'is the carefully limited exception.'" *Id.* at 851 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). While detention without an initial bond determination is permissible for a limited period under 8 U.S.C. § 1226(c), where, as here, a petitioner has been "detained for far longer," his liberty interests are "more seriously infringed." *Black*, 103 F.4th at 141, 151. In *Black*, the Second Circuit held that one petitioner's liberty interests were "seriously affected" where he faced a "seven-month-long detention" that prevented him from supporting his family financially. *See id.* at 151. Similarly, here, J.M.P. has now been detained for nearly nine months, and his family members submitted letters in the bond proceeding describing how they have been suffering without him. *See* Letters of Support. One of J.M.P.'s aunts wrote that if her "nephew continues to be detained, his young son and his wife will suffer much more, [as] they depend on him." *Id.* at 2.

Given his already prolonged detention, J.M.P.'s private interest is severely affected by the indefinite length of his continued confinement under the stay. *Cf. Sampiao*, 2025 WL 2607924, at *10 (noting that petitioner "faces the prospect of a lengthy detention under the automatic stay regulation" and discussing the procedural paths for DHS to prolong detention). The indeterminate nature of J.M.P.'s future detention is underscored by the possibility that, even if the BIA were to grant J.M.P.'s motion for reconsideration and dissolve the discretionary stay, DHS might once again invoke the automatic stay provision—a possibility that, during the hearing before this Court, the Government did not disclaim. Tr. 27:24-28:4. And even if the BIA were ultimately to affirm the IJ's order of release but remand to the IJ to set further bond conditions, DHS could still

potentially invoke another automatic stay to further delay release—as it has done in another case in this District in which J.M.P.'s counsel represents the petitioner, *see J.J.O.H. v. Arteta*, No. 25 Civ. 5278 (S.D.N.Y. filed June 24, 2025).

Additionally, the conditions of J.M.P.'s detention heighten his interest in freedom from confinement. In assessing the first *Mathews* factor, courts consider the conditions of confinement, including whether they are indistinguishable from criminal incarceration. *See Velasco Lopez*, 978 F.3d at 852 (noting that a noncitizen was incarcerated in conditions identical to those imposed on criminal defendants convicted of "violent felonies and other serious crimes"). J.M.P. is experiencing all the deprivations of incarceration, including loss of contact with family and friends, loss of income, lack of privacy, and restrictions on his movement. Moreover, J.M.P. is detained in the Orange County Jail, a facility that houses civil immigration detainees, pre-trial criminal arrestees, and incarcerated prisoners serving criminal sentences. *See* Pet'r Mem. at 13-14. Although the Government notes that he is being held in a unit exclusively for ICE detainees, *see* Gov't Opp'n at 11 n.5, the facility has been the subject of complaints for its treatment of ICE detainees, including allegations of medical neglect, lack of access to unspoiled food, and abuse, harassment, and retaliation by jail personnel.[22]

Finally, the Government argues that "consideration of the private interest must also account for the fact that an alien who lacks lawful status is not simply asserting a right to 'liberty in the

---

[22] *See Ortiz et al. v. Orange Cnty., N.Y. et al.*, No. 23 Civ. 2802, ECF No. 81 (S.D.N.Y. filed Apr. 4, 2023) (lawsuit alleging retaliation against immigrants detained at Orange County Jail who organized to speak out against the dangerous conditions and inhumane treatment at the jail); Letter from NYU Law Immigrant Rights Clinic, et al., to Katherine Culliton-González & Shoba Sivaprasad Wadhia, DHS Officers for Civil Rights and Civil Liberties; Joseph V. Cuffari, DHS Inspector General; and David Gersten, DHS Ombudsman (Mar. 21, 2023), https://www.law.nyu.edu/sites/default/files/2023.March_.21.%20CRCL%20Complaint%20re%20OCCF.pdf [https://perma.cc/VYB7-DB7Q].

abstract, but liberty *in the United States*.'"  Gov't Opp'n at 10-11 (citing *Perez Flores v. Bondi*, No. 25 Civ. 306, 2025 WL 1921748, at *6 (W.D.N.Y. July 14, 2025) (emphasis in original)).  The Government argues that "[i]f all J.M.P. seeks is liberty—as opposed to liberty in the United States despite having no legal basis for his presence—it is his conduct, not the government's, that is standing between him and that liberty."  *Id.* at 11 n.4.  The Government appears to be suggesting that, to obtain his freedom, J.M.P. could simply accept deportation to El Salvador—the country where he has said he fears harm and persecution if he returns.  That is no alternative.  J.M.P.'s appeal of the denial of his applications for asylum, withholding of removal, and CAT protection are still pending before the BIA, and he has the right to pursue that appeal.  *See* Pet. ¶ 33.  The Government's position is essentially that someone subject to removal has no liberty interest inside of the United States.  But that view is foreclosed in the Second Circuit, which has clearly indicated that, even where a noncitizen is subject to mandatory detention, the time in which an appeal is pending matters for purposes of determining whether detention has become so prolonged as to violate due process.  *See Black*, 103 F.4th at 151.  "[T]o conclude that [Petitioner's] voluntary pursuit of [legal] challenges renders the corresponding increase in time of detention reasonable, would 'effectively punish [him] for pursuing applicable legal remedies.'"  *Giron v. Shanahan*, No. 15 Civ. 2951, 2015 WL 5334046, at *4 (S.D.N.Y. Sep. 11, 2015) (second, third, and fourth alteration in original) (quoting *Leslie v. Att'y Gen. of the U.S.*, 678 F.3d 265, 271 (3d Cir. 2012)).

Accordingly, the Court concludes that the first *Mathews* factor weighs heavily in favor of J.M.P.

### B.    The Risk of Erroneous Deprivation

"The second *Mathews* factor is 'the risk of an erroneous deprivation of such [private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.'"  *Black*, 103 F.4th at 152 (alteration in original) (quoting *Mathews*, 424

U.S. at 335). "The only interest to be considered at this part of the *Mathews* analysis is that of the detained individuals—not the government." *Id.* (citing *Hamdi*, 542 U.S. at 530). Upon review, the Court concludes that the stay procedures followed here have created a substantial risk of erroneous deprivation of J.M.P.'s interest in being free from arbitrary confinement, and that this risk is not cured by J.M.P.'s pending motion for reconsideration.

1.    The Automatic and Discretionary Stays

*First*, a stay creates a risk of erroneous deprivation where a detainee has already prevailed in an adversarial hearing and been ordered released on bond. Multiple district courts, in considering challenges to automatic stays under Section 1003.19(i)(2), have found a "significant risk of erroneous deprivation . . . because the only detainees subject to the automatic stay are those whose detention an IJ has already determined to be unsupported by sufficient evidence." *Arcos*, 2025 WL 2856558, at *2; *see also, e.g.*, *Martinez*, 2025 WL 2598379, at *3; *Sampiao*, 2025 WL 2607924, at *10; *Garcia Jimenez*, 2025 WL 2374223, at *3; *Günaydın*, 784 F. Supp. 3d at 1187.

The same is true here. Following an adversarial hearing and individualized consideration of the evidence, IJ Prieto found that DHS had not met its burden to establish that J.M.P. presents either a danger to the community or a flight risk that cannot be mitigated by conditions of supervision or monetary bond. *See* Written Bond Order at 3-5. Moreover, the IJ found that J.M.P. has "significant mitigating factors, including dedicating his weekends to food drives, youth sports programs, and maintenance projects with the Beth Gabriel Jewish Center, an Orthodox synagogue in Queens." Written Bond Order at 4. The IJ wrote that "[m]embers of this congregation provided letters of support, singing the praises of the Respondent's 'cheerful,' 'hardworking,' and 'dependable' nature, describing him as 'beloved by staff and participants alike,' and offering that 'our community will help him find a place to stay if he needs it. His contribution is irreplaceable.'"

*Id.*  Significantly, the IJ's order rested not only on DHS's failure to meet its burden, but also on J.M.P.'s compelling mitigating evidence.

*Second*, the lack of opportunity for J.M.P. to be heard before either stay was entered heightens the risk of erroneous deprivation.  The automatic stay "is effectively a unilateral automatic stay pending appeal as of right afforded to the losing party. . . ."  *Herrera*, 2025 WL 2581792, at *10.  By "conferring unreviewable discretionary authority in the [] prosecuting agency official," the automatic stay creates a "conflict of interest . . . that makes erroneous deprivation not just a risk, but likely."  *Id.* at 11.  And the discretionary stay, as it played out here, did not solve this problem.  The Government acknowledges that DHS filed its emergency stay motion around 3:29 p.m. and the BIA issued the stay at 5:29 p.m. without hearing from J.M.P.  *See* Tr. 10:13-17, 11:7-15.  The Government argues, however, that "there was a window in which they could have responded.  It's not that they weren't given an opportunity.  Nothing prevented them from doing so, but they didn't respond in that window."  Tr. 10:18-21.  This argument defies common sense.  "The fundamental requirement of due process is the opportunity to be heard 'at a *meaningful* time and in a *meaningful* manner.'"  *Mathews*, 424 U.S. at 333 (emphases added) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  A two-hour window provides no meaningful opportunity to respond, particularly where, as here, there was no advance notice that the window would be closing.  Thus, while the automatic stay gave J.M.P. literally no opportunity to be heard, the discretionary stay process in this case, as a practical matter, gave him no such opportunity either.

*Third*, the risk of erroneous deprivation caused by the stay is exacerbated by the lack of any burden placed on DHS to prove the need for J.M.P.'s continued detention.  Where, as here, a noncitizen's detention has become unreasonably prolonged, "the government [must] justify continued detention by clear and convincing evidence."  *Black*, 103 F.4th at 157.  "Where an individual's liberty is at stake, the Supreme Court has consistently used this evidentiary standard

for continued detention." *Id*. But courts have cautioned that the automatic stay regulation "allows the government to bypass its burden of proof at bond hearings," thereby increasing the risk of erroneous deprivation of a noncitizen's liberty interest. *Sampiao*, 2025 WL 2607924, at *10; *see also, e.g.*, *Ashley*, 288 F. Supp. 2d at 671(noting that the automatic stay provision "produces a patently unfair situation by 'tak[ing] the stay decision out of the hands of the judges altogether and giv[ing] it to the prosecutor who has by definition failed to persuade a judge in an adversary hearing that detention is justified'" (alteration in original) (quoting David Cole, *In Aid of Removal: Due Process Limits on Immigration Detention*, 51 Emory L.J. 1003, 1031 (2002)). By empowering DHS to unilaterally override the decision of the IJ, the automatic stay vitiates the burden of proof placed as a matter of constitutional due process on the party urging detention. Indeed, DHS appears here to have made very little effort to prove the need for continued detention at the bond hearing: counsel spoke exclusively about the statutory basis for mandatory detention in her opening argument, addressing danger and flight risk only cursorily in response to J.M.P.'s counsel's arguments. *See* Bond Tr. 4:12-5:13.

And, under the particular facts of this case, the concern that DHS has bypassed its burden to prove the need for detention applies equally to the discretionary stay. The Government argues that the discretionary stay decision "is not . . . automatic or unilateral, because it must be made by the BIA, which is free to grant or deny the stay." Gov't Suppl. Br. at 6. It is true that the discretionary stay is not unilateral in the same sense as the automatic stay, as it requires the approval of a member of the BIA. But the one-sided way in which the discretionary stay was obtained here—within two hours of DHS's submission, on an incomplete record, without a response from J.M.P., and without any apparent standards governing the decision—similarly relieved DHS of its burden to justify detention.

*Fourth*, compounding all the above problems, neither the automatic stay regulation nor the discretionary stay regulation contains any standards for individualized consideration of a stay application. *See* 8 C.F.R §§ 1003.19(i)(1)-(2), 1003.6(c)(5). Multiple courts have held that the automatic stay procedure creates an "extraordinarily high" risk of erroneous deprivation of a noncitizen's liberty interest because "the text of the regulation provides no identifiable standard," and the regulation "provides no discernable process to guide the relevant agency official's decision, other than it must be invoked pursuant to undefined DHS review procedures, and the vague requirement that an official must certify that the stay has evidentiary and legal support." *Vazquez*, 2025 WL 2676082, at *19; *see also, e.g., Günaydın*, 784 F. Supp. 3d at 1188. The same is true of the discretionary stay process in this case. The governing regulation provides no standards, stating only that the BIA "has the authority to stay the order of an immigration judge redetermining the conditions of custody of an alien when the Department of Homeland Security appeals the custody decision or on its own motion." 8 C.F.R § 1003.19(i)(1).

The absence of any standard in the regulation itself might be of no moment if the agency—through, for example, official guidance, regular practice, or in the course of making the particular decision at issue—imposed meaningful standards on the grant or denial of a stay. "The fact that the issuance of a stay is left to the court's discretion does not mean that no legal standard governs that discretion." *Nken*, 556 U.S. at 434 (internal quotation marks and citation omitted). Under traditional stay principles, "[a] stay is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Id.* at 433 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). It is instead "an exercise of judicial discretion" that turns "upon the circumstances of the particular case." *Id.* And the party requesting a stay "bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34. The traditional factors to be considered are "(1) whether the stay applicant has made a strong showing

36

that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

Here, there is no evidence that *any* standards were required or applied, let alone the traditional stay standards. DHS's Emergency Stay Motion cited no legal standard for the issuance of a discretionary stay. *See* Emergency Stay Mot. The order granting the stay stated only that the BIA had considered "all information"—but the only information before it was *DHS's submission*, which included no record whatsoever of the IJ's reasoning, or any of J.M.P.'s evidence that contributed to the IJ's decision. *See* BIA Stay Order; Emergency Stay Mot. The order contained no reference to any individual circumstance in J.M.P.'s case. *See* BIA Stay Order. Nor does there appear to be any agency policy that might have guided the BIA's decision. *See* Pet'r. Suppl. Br. at 6 n.6; *see also Fact Sheet: BIA Emergency Stay Requests*, U.S. Dep't of Justice (March 2018).[23] Thus, while the term "discretionary stay" implies an exercise of discretion, there is no indication that any such discretion was actually exercised here. *Cf. Anderson v. McElroy*, 953 F.2d 803, 806 (2d Cir. 1992) ("When faced with cursory, summary or conclusory statements from the BIA, we cannot presume anything other than . . . an abuse of discretion.").

That is why cases suggesting that, in light of due process concerns, a discretionary stay is normally a sound alternative to an automatic one are inapposite here. *See, e.g., Günaydın*, 784 F. Supp. 3d at 1189. These courts have generally assumed that, in considering a discretionary stay application, the BIA will proceed in an orderly manner and apply the "traditional" stay factors set

---

[23] Available at https://www.justice.gov/eoir/page/file/1043831/dl?inline [https://perma.cc/2T7T-5YXC].

forth in *Nken v. Holder*.  *See, e.g.*, *Günaydın*, 784 F. Supp. 3d at 1188-89 (describing a "traditional stay on appeal" by reference to *Nken*, and then noting that Section 1003.19(i)(1) follows "a more traditional process" whereby the BIA considers "the individual circumstances and merits of the case"); *Zavala*, 310 F. Supp. 2d at 1078 (stating, without citation, that after requesting a discretionary stay "[t]he government would then need to demonstrate that it was likely to succeed on the merits of its appeal to the Board and that it would suffer irreparable harm in the interim"); *Quispe-Ardiles*, 2025 WL 2783800, at *9 (following *Günaydın* and stating that "8 C.F.R. § 1003.19(i)(1) allows DHS to request a discretionary stay of an individual's release on bond through which the BIA considers the individual circumstances and merits of the request"); *Luna Quispe*, 2025 WL 2783799, at *8 (stating that a discretionary stay "requires the BIA to consider the individual circumstances and merits of the request"); *Hasan*, 2025 WL 2682255, at *12 (same); *Alves da Silva*, 2025 WL 2778083, at *5 (explaining that the discretionary stay "would require the BIA to make some individualized determination as to whether the government is likely to succeed in arguing on appeal that the noncitizen's release poses a risk of danger or flight"); *Arce*, 2025 WL 2675934, at *6 (describing the discretionary stay as "more like the traditional process of requesting a stay from an appellate court"); *Leal-Hernandez*, 2025 WL 2430025, at *14 (noting that to obtain a discretionary stay, "the Government would have been obliged to demonstrate to the BIA's satisfaction that a stay was appropriate based on review of Petitioner's individual case").  But as explained above, there is no indication here that the BIA applied the traditional standard governing stays on appeal—indeed, there is nothing in the record whatsoever indicating what standard the BIA may have applied.

The Government's interest in preventing danger to the community and ensuring appearance at future proceedings is undoubtedly significant.  No judge is infallible, and if DHS believes that an immigration judge has erred in granting release, it is certainly entitled to seek a stay pending

appeal.  The Court agrees with its sister courts that a discretionary stay, were it granted with notice and a meaningful opportunity to be heard, on a complete record, employing clear standards akin to the traditional stay factors, and with a reasonably definite expiration date, would likely satisfy due process.  And to the extent that such due consideration of a discretionary stay application takes time, a "temporary stay of release orders merely for purposes of allowing the BIA to decide whether to grant a full stay pending appeal" may be appropriate in some circumstances.  Cole, *supra*, at 1031.  Under the second *Mathews* factor, a process with the aforementioned features would provide procedural safeguards to guard against erroneous deprivation while also accommodating the Government's interests.  But those are not features of the discretionary stay in *this* case.

### 2.    The Motion for Reconsideration

The Government argues that "even assuming that [J.M.P.] could not have filed a response promptly after DHS filed its motion through the BIA's electronic filing system," the motion for reconsideration filed later that evening "provides J.M.P. with a constitutionally sufficient opportunity to be heard."  Gov't Suppl. Br. at 6-7.  Essentially, the Government argues that J.M.P. was not entitled to pre-deprivation due process because the motion for reconsideration offers him a post-deprivation opportunity to be heard.

The Court disagrees.  As an initial matter, the Government's position here—that the motion for reconsideration constitutes adequate process—contradicts the position it has taken before the BIA—namely, that the motion for reconsideration is not a proper vehicle to adjudicate J.M.P.'s objections to the stay of his bond determination.  *See* Recons. Opp'n at 3 (arguing that the motion for reconsideration was "a pre-emptive merits brief disguised as a motion to reconsider," that the arguments it raised were "properly addressed [in] the underlying appeal," and that "[a]llowing respondents to relitigate stay determinations through motions to reconsider would undermine the

Board's ability to manage its docket and would invite serial motion practice in every case where a stay is granted").  That is, in opposing J.MP.'s motion for reconsideration, DHS did not merely argue that the motion was meritless, but that it would be *improper* for the BIA to consider the merits of the issues J.M.P. raised in that posture, rather than in its decision on the custody appeal. It is therefore difficult to credit the Government's position before this Court that the reconsideration motion provides ample process to assuage the constitutional concerns raised here.

More fundamentally, the Government cites no authority within this Circuit for the adequacy of a post-deprivation hearing in cases involving civil deprivations of "the most significant liberty interest there is—the interest in being free from imprisonment."  *Black*, 103 F.4th at 151.  And, in this context, courts outside of this Circuit have held that "[p]rocedural due process generally requires that the state provide a person with notice and an opportunity to be heard before depriving that person of a property or liberty interest."  *Hamama v. Adducci*, No. 17 Civ. 11910, 2018 WL 1905074, at *2 (E.D. Mich. Apr. 23, 2018) (quoting *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 904 (6th Cir. 2014)).  The Court agrees that "allowing a detainee to be heard after the deprivation has already occurred does not satisfy due process."  *Id.*

But even assuming that post-deprivation process could theoretically be adequate in these circumstances, the motion for reconsideration here cannot, under the facts of this case, satisfy due process, for several reasons.  *First*, there is no indication that the motion for reconsideration is an adequate post-deprivation remedy because there is no known timeline for its adjudication.  In the context of deprivations of property without a hearing, due process may be satisfied in certain circumstances by a "prompt" post-deprivation hearing.  *See, e.g.*, *Connecticut v. Doehr*, 501 U.S. 1, 22 (1991) ("Our cases have repeatedly emphasized the importance of providing a prompt postdeprivation hearing at the very least.");  *Spinelli v. City of New York*, 579 F.3d 160, 173 (2d Cir. 2009) (holding that after City took possession of "property pending investigation, it was

incumbent upon the City to provide a prompt hearing").  Here, more than four weeks have elapsed since J.M.P. filed his motion for reconsideration; it has not yet been adjudicated.  In light of the two hours it took to grant the stay, the motion for reconsideration has already failed as a "prompt" post-deprivation remedy.  When asked by this Court about the expected timeline, the Government represented that it did not "have a specific timeline on the motion for reconsideration."  Tr. 15:18-19.  At the time of the hearing before this Court in late September, Petitioner's counsel represented that they had two pending motions for reconsideration of discretionary stays in other cases, filed in June and July of this year.  Tr. 15:13-16.  In one of those cases, the BIA recently issued a decision on the custody appeal without first deciding the motion for reconsideration of the discretionary stay.  *See J.J.O.H. v. Arteta*, No. 25 Civ. 5278, B.I.A. Decision in *Matter of J.J.O.H.* at 3, ECF No. 53-1 (S.D.N.Y. Oct. 3, 2025).  A motion for reconsideration of a stay pending appeal is an exercise in futility—and is hardly "prompt"—if it is not decided before the underlying appeal.

The absence of a prompt timeline for adjudication of the motion for reconsideration is particularly problematic here, where the underlying constitutional violation is prolonged detention without due process to determine whether J.M.P.'s continued confinement is justified.  At the time of the Court's prior Order, J.M.P. had been detained for more than seven months; it has now been almost nine months.  A clear and timely process for him to be heard was therefore of the essence, but the discretionary stay has prolonged the resolution of his constitutional claim for an indeterminate amount of time.  And the Court cannot rely on the motion for reconsideration to alleviate constitutional concerns arising from prolonged detention because there is no guarantee of a prompt hearing, or any timeline whatsoever for the motion's disposition.  Doing so would only compound rather than ameliorate the constitutional violation.

*Second*, the same lack of standards that plagues the stay grant itself applies equally to the motion for reconsideration.  Without any established guidelines for when a stay should be granted,

there is nothing to guide the BIA's decision whether to reconsider the stay.  Accordingly, J.M.P. continues to face a significant risk of erroneous deprivation of his liberty interest even after filing the motion for reconsideration.

*Third*, the motion for reconsideration presents constitutional questions that the BIA lacks jurisdiction to decide.  *See Öztürk v. Hyde*, 136 F.4th 382, 400 (2d Cir. 2025) (noting that "neither the IJ nor the BIA has 'jurisdiction to decide constitutional issues'" (quoting *Rabiu v. INS*, 41 F.3d 879, 882 (2d Cir. 1994))).  In his original petition, J.M.P. raises due process challenges to his continued detention that are beyond the jurisdiction of the BIA and properly considered in habeas proceedings before this Court.  *See id.*; see *also Mahdawi v. Trump*, 136 F.4th 443, 452 (2d Cir. 2025); *cf. Black*, 103 F.4th 133.  His argument on this Motion—that the stay effectively frustrates relief for the underlying due process violation—is similarly beyond the BIA's jurisdiction.

Respondent cites *A. v. Garland*, No. 23 Civ. 1696, 2023 WL 8469655, at *2 (D. Minn. Dec. 7, 2023), and *Organista v. Sessions*, No. 18 Civ. 285, 2018 WL 776241, at *3 (D. Ariz. Feb. 8, 2018), for the proposition that a motion for reconsideration of the grant of a discretionary stay likely "cured" any due process violation.  Neither case definitively held, however, that the availability of a motion for reconsideration cured what was otherwise a clear due process violation.  Rather, the court in *A v. Garland* declined to decide whether the petitioner's due process rights had been violated, 2023 WL 8469655, at *2, while the court in *Organista* concluded based on the totality of the circumstances—including the fact that the petitioner did not even file a motion for reconsideration—that the petitioner had not shown a likelihood of success on his due process claim, 2018 WL 776241, at *3.  In any event, neither court was confronted with the facts present here, which, for the reasons stated above, render the motion for reconsideration inadequate to vindicate J.M.P.'s due process rights.

42

In sum, the Court concludes that the second *Mathews* factor—risk of erroneous deprivation of the private interest in freedom from confinement—weighs heavily in favor of J.M.P.

### C.    The Government's Interest

"The third *Mathews* factor considers 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Black*, 103 F.4th at 153 (quoting *Mathews*, 424 U.S. at 335). The Government has previously articulated two legitimate interests recognized in *Black*: "(1) ensuring the noncitizen's appearance at proceedings, and (2) protecting the community from noncitizens who have been involved in crimes that Congress has determined differentiate them from others." *Id.* As the Court previously held, the additional procedural safeguards allowed in *Black* "do nothing to undercut those interests," because "[a]t any ordered bond hearing, the IJ would assess on an individualized basis whether the noncitizen presents a flight risk or a danger to the community." *Id.* at 153-54. Here, the IJ has conducted an individualized assessment of the record after an adversarial hearing and concluded that J.M.P. presents no danger to the community and no flight risk that cannot be mitigated by a $15,000 bond. *See* Written Bond Order at 3-5. The Government obviously disagrees with that conclusion, but the basis for its disagreement is not entirely clear; in the bond record and before this Court, the Government has offered shifting justifications for its interest in detaining J.M.P.

First, the Government has been inconsistent in its characterization of J.M.P.'s contacts with MS-13 as a teenager in El Salvador. Importantly, the Government has never argued that J.M.P. is a member of MS-13 or any other criminal organization. *See* Tr. 26:2-6 (Government counsel stating that "[t]he government has not taken the position in this case that J.M.P. is a member of MS-13"); Second Lauterback Decl. ¶ 11 ("I have represented J.M.P. in immigration court since February, 2025 and the government has never once alleged, in writing or in court, that J.M.P. is an

associate of any gang or criminal organization."). To the contrary, DHS has acknowledged that the small payments J.M.P. made to MS-13 when he was a minor in El Salvador were extortion payments, i.e., payments that he made only under threat of violence. *See* Emergency Stay Mot. at 12 ("The record of [removal] proceedings established that the respondent paid extortion fees to the 'Mara Salvatrucha,' or MS-13, when he was a teenager working in his family's bakery."). The Government did not argue otherwise in its opposition to J.M.P.'s habeas petition. *See* Gov't Habeas Opp'n.

Nevertheless, in its opposition to J.M.P.'s Motion, the Government describes its "interest in maintaining custody of a suspected associate of MS-13 while the BIA undertakes further review." Gov't Opp'n at 12; *see also id.* at 14 (arguing that risk of flight and harm "are especially salient here where ICE suspects that J.M.P. has ties to MS-13, a designated foreign terrorist organization"). At the hearing before this Court, however, the Government acknowledged that "[t]he use of the word associated with or suspected associate of might not have been the most artful term," and reiterated that "there was no intention to suggest we are taking the position he is a member of MS-13." Tr. 32:17-20. The Government's reference to J.M.P.'s "ties" to the gang was intended only to "illustrate a link," with "that link being the payments." Tr. 32:17-21. That is, the Government confirmed that the extortion payments of $25 on a few occasions were the only evidence supporting any purported "association" by J.M.P. with MS-13. Tr. 32:22-25. The IJ categorically rejected any suggestion that these small payments, made under threat of violence when he was a teenager, render J.M.P. a danger to the community, and this Court has no reason to question that determination.[24]

_____

[24] As the Court previously noted, whether or not these payments support a statutory ground of inadmissibility under the TRIG bar is a separate question from whether they support his continued

Second, it is unclear how much the Government is relying on J.M.P.'s juvenile criminal history in El Salvador in opposing his release. In its two briefs in response to J.M.P.'s Motion and at the hearing before this Court, the Government has not argued that J.M.P.'s 2015 conviction for attempted aggravated homicide supports its interest in keeping him detained. *See* Gov't Opp'n at 13-14; Gov't Suppl. Br.; Tr. Perhaps this is because the Government has never disputed, at least on the record here, that J.M.P.'s conviction arose from an incident in which no one was injured. *See* Gov't Habeas Opp'n at 3 & n.1 (citing Letter of Correction). Nor did DHS address the 2015 conviction in its argument at the bond hearing, other than obliquely in response to J.M.P.'s argument—though even then, it is not entirely clear whether DHS was referring to the conviction or to the payments to MS-13. *See* Bond Tr. 10:16-20 (stating that "the lack of criminal activity, especially in consideration with his past, is not an indication . . . that he has been rehabilitated here in the United States simply because he does not have a criminal past"); *id.* at 10:20-11:2 ("When the criminal past or the contact that he had back in . . . in El Salvador, I understand that [he] is trying to minimize his encounters with MS13, . . . but it was 24-25 dollars and at least three, four times . . . ."). In its Notice of Appeal and Emergency Stay Motion to the BIA, however, DHS emphasized J.M.P.'s juvenile criminal history in a manner that suggested, incorrectly, that he had killed someone. *See* Notice of Appeal at 9 (stating that J.M.P. was "wanted for killing another human being in El Salvador").

Ultimately, the IJ considered the evidence and, "while not minimizing the seriousness of this incident," concluded that an incident that "occurred when [J.M.P.] was a child and in which

---

detention after nearly nine months. *See J.M.P.*, 2025 WL 2614688, at *5. Only the latter question is before this Court. *See Öztürk*, 136 F.4th at 400. As for the former, J.M.P. has appealed the IJ's removal order to the BIA, Pet. ¶ 33, and if the BIA affirms, he has the right to file a petition for review in the Second Circuit.

he was the only one injured does not render [him] a danger to the community a decade later." Written Bond Order at 4. The IJ also noted that J.M.P. "has no criminal history during his five years in the United States." *Id.* at 3. This Court finds no reason to disregard the IJ's conclusion. [25]

Accordingly, the Court concludes that the third *Mathews* factor does not outweigh J.M.P.'s significant private interest in freedom from confinement and the extremely high risk of erroneous deprivation of that interest.

* * *

Considering all three *Mathews* factors, the Court concludes that J.M.P. has been deprived of due process by the successive stays of the IJ's order releasing him on bond.

## III. Remedy

The Court next turns to the remedy. J.M.P. asks that this Court "issue a temporary restraining order and preliminary injunction ordering Respondents to immediately release Petitioner from their custody, subject to reasonable and appropriate conditions, and enjoin Respondents from arresting him for civil immigration detention purposes." App. at 2. The Government argues that, if any remedy is appropriate, the appropriate one would not be immediate release but "release[] only upon satisfying the conditions already set by the immigration judge, *i.e.*, upon posting the $15,000 bond." Gov't Opp'n at 18. On this point, the parties do not seem

---

[25] The Court notes that, while the Government does not press any such argument here, DHS argued before the IJ and BIA that J.M.P.'s arrest by the DEA immediately prior to his detention supported a finding of dangerousness. *See* Bond Tr. 11:11-13 (highlighting "the circumstances of how he came into custody, where DEA was involved"); Notice of Appeal at 9 (asserting that J.M.P. "continued to engage in criminal activity when he came to the United States"); Emergency Stay Mot. at 13 (arguing that J.M.P. is a danger to the community because of "his suspected criminal activity that led to an arrest by the DEA"). The IJ considered and rejected the notion that the DEA investigation—which ultimately did not lead to any charges—supported a finding of dangerousness. *See* Bond Tr. 17:22-19:11. In any event, here, the Government has not relied on the DEA arrest to support its asserted interest in keeping J.M.P. detained.

to disagree: J.M.P. asks no more than for this Court to "effectuate the IJ's well-reasoned custody determination." Pet'r Mem. at 21. Accordingly, any release must be on bond under the conditions set by the IJ.

In a footnote in its supplemental brief, the Government raises the prospect of another remedy short of immediate release. In a habeas class action, the district court in *Hamama* held that the discretionary stay procedure raised due process concerns due to "lack of notice and opportunity to be heard, as well as lack of clear decisional standards." *Hamama*, 2018 WL 1905074, at *2. The Court ordered that any discretionary stay that had already been granted by the BIA would expire within two weeks, unless by that date the government filed a renewed request and notice of that request was given to the detainee; in that event, the discretionary stay previously granted would expire within four weeks, unless the BIA extended the stay based on a finding that the government had made a strong showing that it was likely to succeed on the merits. *Id.* at *3.

The Court has considered this path, however, and concluded that it is insufficient to remedy the due process violation already suffered by J.M.P. under the facts of this case. J.M.P. has been detained for nearly nine months. Since the Court's conditional grant of the writ of habeas corpus on September 10, 2025, the underlying constitutional error has only been compounded, not cured. The procedures employed by DHS to stay the IJ's bond order threaten to extend that timeline for many more months, with no particular end in sight and no guarantee that the process going forward will meaningfully redress J.M.P.'s constitutional injuries. The Court therefore declines to prolong the process further in the hope that these errors—which are now multiple—will be cured. *See Fernandez Aguirre*, 2019 WL 4511933, at *3 ("If the Government fails to cure the error, the court may grant the petition in full and order the Petitioner's release."); *cf. Quintanilla v. Decker*, No. 21 Civ. 417, 2021 WL 707062, at *2 (S.D.N.Y. Feb. 22, 2021) (granting immediate release where the "BIA appeal, though still pending, is futile and unable to adequately address Petitioner's

substantial constitutional question"); *Lopez Benitez v. Francis*, No. 25 Civ. 5937, 2025 WL 2371588, at *14 (S.D.N.Y. Aug. 13, 2025) (holding that "given the nature of the constitutional violation" in that case—in which the government had detained a noncitizen without any individualized assessment of the need for his detention after having previously released him on his own recognizance—"any post-deprivation review by an immigration judge would be inadequate"); *Mata Velasquez v. Kurzdorfer*, No. 25 Civ. 493, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025) (holding that because the petitioner had "not yet been given any opportunity to be heard— let alone a meaningful opportunity—his detention is unlawful, and he must be released").  Indeed, the vast majority of district court opinions concluding that the automatic stay deprived a petitioner of due process in recent months have ordered immediate release as the remedy.  *See supra* notes 20 & 21; *see, e.g.*, *Leal-Hernandez*, 2025 WL 2430025, at *15 (after finding automatic stay violated due process, ordering release on the conditions set by the immigration judge, and declining "to stay its order so that the Government may seek a discretionary stay through the BIA," because "[t]he court is uninformed of the expected duration of such a process and finds it unfair to delay further Petitioner's release").

Accordingly, the Court will order J.M.P.'s release on the conditions of bond set by the IJ.

## CONCLUSION

For the foregoing reasons, Petitioner's Motion is **GRANTED and J.M.P. is ordered released on the conditions set by the IJ**.

It is important to note what this Court did *not* rule.  First, the Court's decision today is not about the merits of J.M.P.'s request for bond.  This Court has not conducted its own bond hearing and held, as a matter of first impression, that J.M.P. "should" be released on bond.  That determination was made by the IJ, who concluded that release on bond was appropriate because J.M.P. did not pose a danger to the community and any risk of flight could be addressed through

a high bond.   Rather, the issue presently before this Court is a question of constitutional due process.   Applying binding Second Circuit authority, the Court previously held that, because of J.M.P.'s prolonged confinement, due process required that he receive a meaningful bond hearing at which the Government would bear the burden of proving the need for his continued detention by clear and convincing evidence.   While J.M.P. did receive a hearing, the stay procedures employed here nullified the IJ's bond determination and relieved the Government of its burden, rendering the bond hearing a mere formality.   But the Court has been presented with no governmental interest that justifies J.M.P.'s continued detention in spite of the IJ's decision, given the significant private liberty interest at stake and the high risk of error associated with the particular stay procedures employed by DHS here.

But that leads to a second point: nothing in this opinion should be interpreted to suggest that DHS may not, as a general matter, properly obtain a stay pending appeal of an immigration judge's bond determination.   And there is nothing in this opinion that would prohibit a short-term administrative stay to freeze the status quo in order to permit due consideration of a discretionary stay application, in which all sides have a meaningful opportunity to be heard, the decisionmaker applies the factors traditionally governing applications for a stay pending appeal, and a decision is rendered promptly.   But that is not what happened here.   Rather, DHS initiated an automatic stay of the IJ's decision, with no individualized consideration of J.M.P.'s case.   And when J.M.P. challenged that act, DHS dissolved that stay to evade review, and then sought and obtained a discretionary stay to replace it—in two hours, without any meaningful opportunity for J.M.P. to be heard, without consideration of the IJ's reasoning in granting bond, without any explanation of the governing standard for such a request, and with no indication as to its duration.   Under these facts, the second stay was "discretionary" in name but automatic in practice.   And through this essentially *ex parte* process, DHS sought to consign a detainee—whose constitutional rights have

already been violated by prolonged detention without a bond hearing—to continued detention for an indeterminate period.  Due process requires more than that.

Upon submission of the bond payment, Respondents are **ORDERED** to release J.M.P. from their custody.  Respondents shall file a status letter to update the Court about Petitioner's status by **October 24, 2025**.

The parties shall file a joint status letter proposing next steps in this litigation and, if necessary, a briefing schedule on J.M.P.'s request for attorney's fees and costs under the Equal Access to Justice Act by **November 3, 2025**.

The Clerk of Court is respectfully directed to close the motion at ECF No. 20.

SO ORDERED.

Dated: October 23, 2025

New York, New York

DALE E. HO
United States District Judge